UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――― x

LI HONG CHENG and NATIONAL
ELEVATOR INDUSTRY PENSION FUND,
Individually and on Behalf of All Others
Similarly Situated,

                     Plaintiff,

    vs.

CANADA GOOSE HOLDINGS INC., DANI
REISS, JONATHAN SINCLAIR, BAIN
CAPITAL, LP, BRENT (BC)
PARTICIPATION S.À.R.L, BRENT (BC)
S.À.R.L, BAIN CAPITAL INTEGRAL
INVESTORS 2008, L.P. and BAIN CAPITAL
INVESTORS, LLC,

                     Defendants.

―――――――――――――――――――― x

: Civil Action No. 1:19-cv-08204-VSB
:
: CLASS ACTION
:
:
: CONSOLIDATED AMENDED
: COMPLAINT FOR VIOLATIONS OF THE
: FEDERAL SECURITIES LAWS

: DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION .......................................................................1

II.     JURISDICTION AND VENUE ...............................................................6

III.    PARTIES ......................................................................................................7

IV.     SUBSTANTIVE ALLEGATIONS ........................................................12

        A.      The Company and Its Business...................................................12

        B.      Following Its IPO, Analysts and Investors Dubbed Canada Goose a
                "Hyper Growth" Company .........................................................14

        C.      During the Class Period, Canada Goose's Inventory Growth
                Begins to Outpace Its Revenue Growth, and the Company
                Experiences Undisclosed Timing Shifts in Its DTC Channel....................15

        D.      Canada Goose Reports 3Q19 Gross Margins Below Analysts'
                Estimates and Hints at Deceleration in the DTC Channel, but
                Continues to Mislead Investors..................................................17

        E.      Canada Goose Misses on Revenue Expectations for the First Time
                Since the IPO and Reveals that FY20 Revenues Will Grow at Half
                the Rate of Prior Years.............................................................19

V.      MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS
        ISSUED DURING THE CLASS PERIOD ..........................................20

        A.      First Quarter 2019 Financial Results .......................................20

        B.      Second Quarter 2019 Financial Results....................................25

        C.      Third Quarter 2019 Financial Results.......................................30

VI.     THE TRUTH EMERGES...........................................................................36

VII.    ADDITIONAL SCIENTER ALLEGATIONS.................................39

VIII.   LOSS CAUSATION/ECONOMIC LOSS .........................................44

IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE
        MARKET DOCTRINE AND *AFFILIATED UTE* DOCTRINE.....................46

X.      NO SAFE HARBOR ...............................................................................47

XI.     CLASS ACTION ALLEGATIONS .................................................................48

       COUNT I Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated
       Thereunder Against Canada Goose and the Individual Defendants ..................................50

       COUNT II Violation of §20(a) of the Exchange Act Against the Individual
       Defendants and the Bain Capital Entity Defendants...........................................................51

PRAYER FOR RELIEF .................................................................................................................52

JURY TRIAL DEMANDED ..........................................................................................................53

Lead Plaintiff National Elevator Industry Pension Fund ("Plaintiff" or "NEIPF"), by and through its undersigned counsel, alleges the following against Canada Goose Holdings Inc. ("Canada Goose" or the "Company"), the Company's Chairman, President and Chief Executive Officer ("CEO") Dani Reiss ("Reiss"), Canada Goose's Chief Financial Officer ("CFO") and Executive Vice President  Jonathan Sinclair ("Sinclair") (collectively, "Defendants") and investment funds advised by Bain Capital, LP ("Bain Capital") and its affiliates (collectively, the "Bain Capital Entity Defendants"),[1] upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (1) review and analysis of public filings made by Canada Goose with the U.S. Securities and Exchange Commission ("SEC"); (2) review and analysis of press releases and other publications disseminated by certain Defendants and other related non-parties; (3) review of news articles, securities analyst reports and shareholder communications; (4) review of other publicly available information concerning Defendants; and (5) information readily obtainable on the Internet.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and control.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      Plaintiff brings this federal securities class action on behalf of itself and all other similarly situated persons or entities (the "Class") who purchased or otherwise acquired the publicly traded common stock of Canada Goose between August 9, 2018 and May 28, 2019, inclusive (the "Class Period"), seeking to pursue remedies for Defendants' violations of §§10(b) and 20(a) of the

---

[1]    In addition to Bain Capital, LP, the Bain Capital Entity Defendants include: (1) Brent (BC) Participation S.à r.l; (2) Brent (BC) S.à r.l; (3) Bain Capital Integral Investors 2008, L.P.; and (4) Bain Capital Investors, LLC.

Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.      Canada Goose was founded in 1957 in Toronto, Canada by defendant Reiss's maternal grandfather.  The early iterations of the Company's down-filled parkas were best known for their functional performance and were often worn in some of the coldest and least hospitable climates on earth.  Reiss joined Canada Goose in the 1990s with visions of expanding the Company's customer base beyond Arctic explorers.  After becoming CEO in 2001, he sought to transform Canada Goose into a luxury brand, in part by pricing the Company's parkas at around $1,000 USD,[2] and by appealing to celebrities, who drove brand interest by being photographed wearing Canada Goose parkas.

3.      In 2013, Reiss sold approximately 70% of Canada Goose to Bain Capital, raising funds for the Company's expansion and putting Canada Goose on the fast-track for an initial public offering ("IPO").  Canada Goose went public in March 2017, at which time the Company's stock began trading on the New York Stock Exchange ("NYSE").

4.      In the two fiscal years that followed, Canada Goose posted an impressive compounded annual growth rate of approximately 40%, earning the designation of a "hyper growth company" by analysts and making Canada Goose a darling of investors.  Throughout this period, Canada Goose's stock price soared, making Reiss, who at the beginning of the Class Period owned approximately 35.5% of the Company's multiple voting shares, a billionaire.

5.      Canada Goose proudly touts its "Made in Canada" heritage and calls its commitment to local manufacturing the "heart" of its "business and brand."  Unlike many retailers that outsource

---

[2]    Canada Goose reports its financial results in Canadian dollars.  Thus, unless otherwise specified, all monetary amounts are in Canadian dollars.  All references to "$" and "dollars" mean Canadian dollars and all references to "USD" mean U.S. dollars.

their production to overseas manufacturers, Canada Goose produces all of its core down-filled jackets in Canada, either at its in-house facilities or through third-party manufacturers.  In fiscal year 2018 ("FY18"), the Company operated five production facilities in Canada, at which it manufactured approximately 43% of its down-filled jackets.

6.  Because Canada Goose produces a significant amount of its core parkas in-house, its inventories are comprised of raw materials, *i.e.*, the cotton, polyester, wool, down and coyote fur used to make its parkas, along with work-in-progress and finished goods, *i.e.*, sellable product. Canada Goose reports its total inventories each fiscal quarter and annually, along with an itemized breakdown of raw materials, work-in-progress and finished goods.

7.  Before the Class Period, Canada Goose reported revenue growth that outpaced the Company's inventory growth.  As a result of its rapidly rising popularity, however, Canada Goose's products often sold out, and the Company had problems delivering products to its wholesale accounts in a timely manner because of production capacity issues.  This left analysts and investors questioning whether supply chain constraints and manufacturing capabilities were hindering the Company's growth.

8.  Then, in the fourth fiscal quarter of 2018 ("4Q18"), Canada Goose accelerated its inventory growth and ramped up the production of finished goods.  For the quarter, the Company delivered an impressive 144% year-over-year ("y-o-y") increase in total revenue, with the Company's direct-to-consumer ("DTC") segment growing a staggering 160% y-o-y.  Analysts viewed Canada Goose's inventory growth, including the ramp in production of finished goods, as one of the drivers of the Company's outstanding 4Q18 results and believed it boded well for its continued growth going forward.

- 3 -

9.      The Class Period begins on August 9, 2018, when Canada Goose reported its financial results for the first fiscal quarter of 2019 ("1Q19").[3]  Analysts took notice of the Company's recent inventory growth, which for the quarter had grown 35.3% y-o-y, although still at a lower growth rate than the Company's revenue, which grew 58.5% in the same period.  Reiss assured investors that Canada Goose was "building demand ahead of supply," that the Company was "making sure that inventory [was] there to meet demand" and told investors that Canada Goose was building inventory in preparation for the heavy selling season in the second half of the fiscal year (*i.e.*, October through March).

10.      On November 14, 2018, Canada Goose reported financial results for the second fiscal quarter of 2019 ("2Q19").  For the first time in four quarters, the Company's y-o-y inventory growth of 46.4% exceeded its y-o-y revenue growth of only 33.7%, with finished goods inventories also increasing 51.4% y-o-y.  In response to questions from analysts about the Company's inventory growth, Defendants reassured investors that its inventory was "consistent with the sorts of levels of revenue growth and network growth that we're talking about."  Defendants' reassurances gave investors the misleading impression that the Company's growing inventories were "healthy" and supported increasing demand and accelerated growth consistent with historical trends.

11.      As the Company's inventories continued to grow, Canada Goose was also experiencing an undisclosed timing shift in the DTC segment.  The Company's DTC segment was critically important to Canada Goose's stated growth strategy and its financial results, particularly because the Company generates higher margins on the products it sells directly through its DTC channel, *i.e.*, at its retail and online stores.  For example, Canada Goose only needs to sell 63 units in

---

[3]      Canada Goose's 2019 fiscal year ended on March 31, 2019.  Therefore, the Company's 1Q19, 2Q19 and 3Q19 ended on June 30, 2018, September 30, 2018 and December 31, 2018, respectively.

its DTC channel to drive the same sales and margin as the sale of 100 units in the Company's wholesale channel.  Further, given the seasonality of its products, Canada Goose typically recognizes a significant portion of its annual DTC revenue in the third and fourth fiscal quarters.  Unbeknownst to investors, consumers in the Company's DTC channel were purchasing heavy weight parkas earlier, which had the potential to (and did) negatively impact the important third and fourth fiscal quarters.

12.     Seeking to capitalize on the artificially inflated price of Canada Goose stock, on or around November 29, 2018, Reiss sold 1.5 million shares of his subordinate voting stock in the Company's Subordinate Voting Shares Offering for proceeds of nearly $97 million USD.  The shares Reiss sold were priced at $64.52 USD – near the stock's all-time high.

13.     The truth was partially disclosed on February 14, 2019, when Canada Goose reported its financial results for the third fiscal quarter of 2019 ("3Q19").  Although the Company reported y-o-y revenue growth, it disclosed gross margin declines in both the wholesale and DTC channels, due in part to a "change in product mix," *i.e.*, customers buying a lower proportion of the high-margin, heavy weight parkas.  Defendants also disclosed, for the first time, "significantly more purchasing occurring earlier" in the DTC channel, and warned that the Company would experience a lower rate of growth in the fourth fiscal quarter of 2019 ("4Q19").

14.     For 3Q19, Canada Goose also reported a second consecutive quarter of outsized inventory growth.  Specifically, the Company's inventories grew 74.5% y-o-y, while its revenue grew only 50.2% in the same period.  Analysts directly questioned Defendants about Canada Goose's inventory growth, inquiring why the Company's inventories remained so elevated even after the Company had purportedly shipped more products in the quarter to its wholesale distributors than it had the prior year.  Defendants now claimed that the inventory was "being built in advance of our

fiscal year 2020" and assured investors that the inventory build "allow[s] us to be very confident about next year and how we'll be able to continue to deliver growth in future seasons."

15.     In response to the news revealed on February 14, 2019, the price of Canada Goose stock fell nearly 13%, but would have fallen further had the full truth been revealed.  Instead, Defendants' shifting explanations for the Company's elevated inventory continued to give analysts and investors the misleading impression that Canada Goose's inflated inventory growth and ramp in the production of finished goods supported increased demand and accelerated growth in line with historical trends.

16.     Finally, on May 29, 2019, Canada Goose announced its financial results for 4Q19 and fiscal year 2019 ("FY19").  For the first time since becoming publicly traded, Canada Goose missed on analysts' expectations for revenue and reported growth of only 29% in the DTC channel, which fell far short of analysts' consensus of 40% growth.  Defendants also provided guidance for fiscal year 2020 ("FY20"), disclosing that they expected annual revenue growth that was half – "at least 20%" – of what Canada Goose had reported for the last three fiscal years.  Defendants also admitted that the Company had shifted its approach from "building demand ahead of supply" to "building inventory ahead of demand."  On this news, shares of Canada Goose stock plummeted, falling over 30%.

## II.     JURISDICTION AND VENUE

17.     This action arises under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

18.     This Court has jurisdiction over the subject matter of this action under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

19.     Venue is proper in this District under §27(c) of the Exchange Act, 15 U.S.C. §78aa(c), and 28 U.S.C. §1391(b)-(d) as Defendants conducted business in this District and subsequent damages took place within this District.  In addition, Canada Goose stock traded on the NYSE, which is located within this District.

20.     In connection with the acts and transactions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mail, interstate telephone and other electronic communications, and the facilities of a national securities exchange.

## III.    PARTIES

21.     Lead Plaintiff NEIPF, a multiemployer Taft-Hartley pension plan with more than $7 billion in assets and established to provide retirement benefits for members of the International Union of Elevator Constructors, purchased Canada Goose stock at artificially inflated prices during the Class Period and was damaged, as detailed herein.  *See* ECF Nos. 18-2, 18-3.

22.     Defendant Canada Goose describes itself as a "global performance luxury outerwear brand," manufacturing products such as coats, lightweight jackets and parkas, some of which retail for upwards of nearly $2,000 USD.  The Company's stock was listed and traded on the NYSE under the ticker symbol "GOOS" throughout the Class Period.

23.     Defendant Reiss is Canada Goose's Chairman, President and CEO and served in those positions throughout the entirety of the Class Period.  According to Canada Goose's website, Reiss "transformed the small outerwear manufacturer founded by his grandfather into a global luxury brand."  According to Canada Goose's SEC filings, Reiss worked "in almost every area of the Company and successfully developed the Company's international sales channels" prior to his 2001 ascension to the role of President and CEO.  As the Company stated in certain SEC filings,

- 7 -

defendant Reiss's role at Canada Goose is to "develop the Company's vision and strategy," "establish the strategic and operational priorities of the Company" and "provide leadership support to the Company's officers for the effective overall management of the business." During the Class Period, defendant Reiss served as the public face of Canada Goose. For example, defendant Reiss – along with defendant Sinclair – gave presentations and answered questions from analyst and investors on behalf of Canada Goose during conference calls to discuss the Company's fiscal 2019 quarterly and annual financial results. At the beginning of the Class Period, Reiss owned approximately 35.5% of Canada Goose's multiple voting shares, or approximately 32.9% of its combined voting power. In connection with Canada Goose's November 28, 2018 offering of ten million subordinate voting shares held by controlling insiders and members of the Board of Directors (the "Selling Shareholders Offering"), Reiss sold 1.5 million shares of Canada Goose stock, generating nearly $97 million USD in proceeds.

24.     Defendant Sinclair was appointed CFO and Executive Vice President of Canada Goose on June 26, 2018, replacing John Black, who had served as the Company's CFO for less than a year. According to Canada Goose's SEC filings, as CFO, defendant Sinclair's role was to have "full oversight over the Company's finance function, including accounting and controls, planning and analysis." Additionally, as CFO, Sinclair was to serve as a "critical leader in the creation, execution and support" of Canada Goose's "global growth strategy." Defendant Sinclair's role was also to act as a "business partner" to defendant Reiss and provide "broad oversight and trusted advice, both at a strategic and tactical level." Like defendant Reiss, defendant Sinclair made

presentations and answered questions from financial analysts during Company-hosted conference calls following Canada Goose's reporting of its fiscal 2019 quarterly and annual financial results.[4]

25.     Defendants Reiss and Sinclair are collectively referred to herein as the "Individual Defendants."   Both of the Individual Defendants made materially misleading statements and omissions to the investing public during conference calls hosted by Canada Goose to discuss the Company's 1Q19, 2Q19 and 3Q19 financial results in August 2018, November 2018 and February 2019, respectively.

26.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Canada Goose, were privy to confidential and proprietary information concerning Canada Goose's inventory, customer demand, gross margins and revenue growth projections. Because of their positions with Canada Goose, the Individual Defendants had access to non-public information about the Company's inventory, customer demand, gross margins and revenue growth projections, via conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.   Because of their possession of such information, the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

27.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.   In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange

---

[4]   Defendant Sinclair was precluded from selling any subordinate voting shares of Canada Goose stock awarded to him as part of his employment agreement in the November 2018 Selling Shareholders Offering because, according to the Company's 2019 Annual Report ("2019 20-F"), his Canada Goose shares did not begin to vest until calendar year 2019.

- 9 -

Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Canada Goose's business.

28.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Canada Goose's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material, non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false or misleading.  The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein and are liable for the false or misleading statements pleaded herein.

29.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was registered with the SEC, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Canada Goose's business and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Canada Goose common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

30.     The Bain Capital Entity Defendants are made up of Bain Capital, LP and a group of investment funds advised by Bain Capital, LP, which describes itself as a leading private, multi-asset alternative investment firm with over $75 billion USD in assets under management.  In December 2013, the Bain Capital Entity Defendants acquired a majority interest in Canada Goose and since that time, Bain Capital, LP Managing Directors, Joshua Bekenstein and Ryan Cotton, have held seats on Canada Goose's Board of Directors.  During the Class Period, the Bain Capital Entity Defendants were entitled to designate 50% of the members of Canada Goose's Board of Directors.

31.     As of the beginning of the Class Period, the Bain Capital Entity Defendants beneficially owned approximately 64.5% of Canada Goose's multiple voting shares, or approximately 59.8% of its combined voting power.  Canada Goose's 2019 20-F acknowledged that the Company was "controlled" by the Bain Capital Entity Defendants and that they had "the ability to exercise substantial control over all corporate actions requiring shareholder approval . . . including the election and removal of directors and the size of [Canada Goose's] board of directors."

32.     In connection with the Selling Shareholders Offering in November 2018, the Bain Capital Entity Defendants sold more than 7.4 million subordinate voting shares on the open market at $64.52 USD per share for gross proceeds exceeding $477 million USD, but by March 31, 2019, still "owned approximately 60.5% of [Canada Goose's] outstanding multiple voting shares, or approximately 54.2% of the combined voting power of [the Company's] multiple voting and subordinate voting shares outstanding."

33.     Accordingly, the Bain Capital Entity Defendants exerted control over both Canada Goose and the Individual Defendants prior to and during the Class Period.

34.     The Bain Capital Entity Defendants, by reason of their status as majority shareholders, with "control over" the Company's "corporate actions" were "controlling persons"

- 11 -

within the meaning of §20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Bain Capital Entity Defendants were able to, and did, directly or indirectly, control the conduct of Canada Goose's business.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The Company and Its Business

35.     Founded in Toronto, Canada in 1957, Canada Goose is one of the world's leading makers of performance luxury apparel.  The Company is best known for its ultra-warm, down-filled parkas, which retail for an average selling price of approximately $900 USD and have become ubiquitous on the streets of Toronto, New York, Chicago and other cold weather metropolises around the world.  In addition to manufacturing and selling its core heavy weight parkas, in recent years, Canada Goose has expanded and diversified its product offering to include lower-margin lightweight down, rainwear, windwear, softshell jackets, knitwear and accessories.

36.     Canada Goose routinely boasts that its products are "Made in Canada" and refers to its Canadian heritage and commitment to local manufacturing as the "heart" of its "business and brand."  Unlike many retailers that outsource their production to overseas manufacturers, Canada Goose produces all of its core down-filled jackets in Canada, either at its in-house facilities or through third-party manufacturers.  In FY18, the Company operated five production facilities in Canada, at which it manufactured approximately 43% of its down-filled jackets.  During the Class Period, Canada Goose expanded its in-house production by opening additional manufacturing facilities.  In FY19, 47% of the Company's total down-filled jacket production was in-house.

37.     Because Canada Goose produces a significant amount of its core parkas in-house, its inventories are comprised of raw materials, *i.e.*, the cotton, polyester, wool, down and coyote fur

used to make its parkas, along with work-in-progress and finished goods, *i.e.*, sellable product. Canada Goose reports its total inventories each fiscal quarter and annually, along with an itemized breakdown of raw materials, work-in-progress and finished goods.

38.     The Company reports its results in two segments which are aligned with its sales channels: wholesale and DTC.  Through its wholesale channel, Canada Goose sold to retail partners and distributors at 2,200 points of distribution as of March 31, 2018, including luxury retailers like Neiman Marcus, Saks Fifth Avenue and Nordstrom.  The Company's DTC channel is comprised of its e-commerce sites and brick-and-mortar retail stores.   At the beginning of the Class Period, Canada Goose made online sales to customers in 12 countries and at its six retail stores.  During FY18, the Company's wholesale channel accounted for 56.9% of Canada Goose's total revenue and its DTC channel accounted for 43.1%.

39.     Given the seasonality of Canada Goose's products, *i.e.*, down parkas and jackets meant to withstand cold temperatures, the Company experiences corresponding seasonal fluctuations in its revenue and operating results.  Specifically, Canada Goose typically realizes a significant portion of its annual wholesale revenue during the second and third fiscal quarters (*i.e.*, July through September and October through December), and typically realizes a significant portion of its DTC revenue in the third and fourth fiscal quarters (*i.e.*, October through December and January through March).  For example, wholesale revenue for the second and third fiscal quarters of 2018 comprised 85.2% of total wholesale revenue for the year and 48.4% of total Company FY18 revenue.  DTC revenue for the third and fourth fiscal quarters of 2018 comprised 88.8% of total DTC revenue for the year and 38.3% of total Company FY18 revenue.  Together, 2Q and 3Q wholesale revenue and 3Q and 4Q DTC revenue comprised ***86.7%*** of the Company's total revenue for FY18.

40.     Prior to and during the Class Period, expansion of the Company's DTC channel was important to its operations, financial results and continued growth.  This is due in part to the fact that the sale of a jacket through Canada Goose's DTC channel provides a two-to-four times greater contribution to segment operating income per jacket than the sale of the same jacket in the Company's wholesale channel.  Accordingly, prior to and during the Class Period, Canada Goose sought to expand its DTC channel through the rollout of additional e-commerce and brick-and-mortar retail stores.  For example, in May 2018, Canada Goose announced that it would be opening two retail stores in China and selling its products online through Alibaba's "T-mall Luxury Pavilion" online platform.  And in June 2018, Canada Goose announced plans to open retail stores in New Jersey, Montreal and Vancouver in time for the 2018 holiday shopping season.

**B.     Following Its IPO, Analysts and Investors Dubbed Canada Goose a "Hyper Growth" Company**

41.     Canada Goose completed its IPO on March 21, 2017.  In the two years that followed, the Company reported annual growth of 39% and 46% for fiscal year 2017 ("FY17") and FY18, respectively.  With respect to its 4Q18 results (announced on June 15, 2018), Canada Goose reported a staggering 144% y-o-y increase in total revenue, with the Company's DTC revenues growing 160% y-o-y, vastly exceeding analysts' consensus of 50% y-o-y growth.  Canada Goose's impressive growth rate earned it the designation of a "hyper growth" company by analysts and investors, with analysts raising earnings expectations nearly every quarter since the Company's IPO.

42.     For example, in June 2018, following the Company's positive 4Q18 results, Evercore issued an analyst report calling Canada Goose "one of [the] top global growth brand stocks" and "one of the most interesting early-stage, hyper-growth brand stocks we have ever seen."  Similarly, in a June 17, 2018 analyst report, CIBC rated Canada Goose an "outperformer" based on the fact that the Company's growth had "vastly exceeded expectations" since the IPO, and noted that Canada

- 14 -

Goose's "earnings growth continues to outpace even the most optimistic expectations," and that the Company had "clearly established itself as a global performance luxury brand."

43.     Defendants were motivated to maintain the market's perception that Canada Goose was a hyper growth company.  Defendant Reiss, in particular, was especially motivated to maintain the Company's growth trajectory and the artificially inflated price of Canada Goose stock given his status as a controlling shareholder, owning 35.5% of the Company's outstanding multiple voting shares (or approximately 33% of the combined voting power of Canada Goose's outstanding voting shares), as of the beginning of the Class Period.  Thus, as Canada Goose's stock price soared during the Class Period, so too did Reiss's personal wealth, which was estimated at over $1 billion as of March 2019.  In November 2018, while shares of Canada Goose were trading near an all-time high, defendant Reiss took advantage of the artificial inflation in the price of Canada Goose stock by selling 1.5 million shares of his personally held stock in the Selling Shareholders Offering for proceeds of nearly $97 million USD – ***more than 100 times his salary for FY19***.

**C.      During the Class Period, Canada Goose's Inventory Growth Begins to Outpace Its Revenue Growth, and the Company Experiences Undisclosed Timing Shifts in Its DTC Channel**

44.     Before the Class Period, Canada Goose's revenue growth had outpaced its inventory growth.  Given that Canada Goose's products were frequently sold out, however, analysts and investors questioned whether supply chain constraints and manufacturing capabilities were limiting the Company's growth.  Then, in 4Q18, Canada Goose accelerated its inventory growth, including the production of finished goods, which grew a total of 31.8% y-o-y (although still at a slower growth rate than revenue).  Analysts viewed the Company's ramp in inventory growth as one of the drivers of the Company's impressive 4Q18 results and believed it boded well for Canada Goose's growth going forward.

- 15 -

45.     By the start of the Class Period on August 9, 2018, Canada Goose's inventories had grown 35.3% y-o-y, and were rapidly increasing.  When analysts and investors took notice of the increase in inventory, Defendants assured them that Canada Goose was not only continuing to "build[] demand ahead of supply," but that the Company was "making sure that inventory [was] there to meet demand."  Defendants also dismissed any concerns about the Company's inventory levels by explaining that Canada Goose was building inventory ahead of the heavy winter selling season.  Analysts and investors believed Defendants' reassurances, which gave them the misleading impression that the Company's elevated inventory levels supported increased demand and continued growth in line with historical trends.

46.     On November 14, 2018, Canada Goose announced its 2Q19 financial results.  For the first time in four quarters, the Company reported inventory growth that outpaced revenue growth, disclosing a 46.4% y-o-y increase in inventory compared to 33.7% revenue growth in the same period.  Analysts again questioned Defendants about the Company's inventory levels, and again Defendants denied that anything was amiss.  For example, Sinclair called the Company's inventory levels "healthy," attributed the increase in inventory to the addition of six retail stores and one e-commerce store and told investors that the Company's inventory levels were "consistent with the sorts of levels of revenue growth and network growth that we're talking about."

47.     As Canada Goose's inventory levels continued to climb throughout the Class Period, the Company was also experiencing timing shifts in its DTC channel that were having an undisclosed, negative impact on Canada Goose's financial results.  In the wholesale segment, Canada Goose recognizes revenue when its products have been shipped to its retail partners, whereas in the DTC segment, the Company recognizes revenue when end-user customers make a purchase.

- 16 -

48.     Although Defendants warned investors that "seasonal fluctuations in wholesale and distributor customer demand" had "shifted the delivery timing of customer orders between quarters" and could "be expected to affect the quarterly pattern of wholesale revenue," they concealed similar timing shifts in the DTC channel.  In order to compensate for timing shifts in the DTC channel and prop up the Company's revenues, Canada Goose rolled out its lower margin spring product line at the beginning of February 2019 (*i.e.*, during its 4Q19), in the midst of unseasonably cold weather. As Defendants would later disclose, however, consumers had been purchasing full winter products earlier as compared to prior years, which had the potential to (and did) negatively impact the Company's 3Q19 and 4Q19 financial results – the most important quarters for its DTC segment.

**D.     Canada Goose Reports 3Q19 Gross Margins Below Analysts' Estimates and Hints at Deceleration in the DTC Channel, but Continues to Mislead Investors**

49.     The truth concealed by Defendants' material misstatements and omissions was partially revealed on February 14, 2019, the day Canada Goose announced its 3Q19 financial results. Although the Company reported y-o-y revenue growth, it disclosed gross margin ***declines*** in both the wholesale and DTC channels.  Defendants blamed the gross margin declines on "higher labour costs due to the onset of Ontario's minimum wage increase," even though the increase had gone into effect an entire year earlier in January 2018.  Defendants also attributed the gross margin declines to "changes in product mix," *i.e.*, customers buying a lower proportion of the Company's high-margin, heavy weight parkas.  Additionally, Defendants disclosed, for the first time, timing shifts in the DTC channel due to "significantly more purchasing occurring earlier."  Defendants cautioned that, as a result of the timing shifts, the Company would experience "a naturally lower rate of speed in both channels through the remainder of the fiscal year," *i.e.*, during the critical fourth fiscal quarter.

- 17 -

50.     Additionally, for the second consecutive quarter, Canada Goose's inventory growth exceeded its revenue growth, increasing 74.5% y-o-y compared to revenue growth of 50.2% in the same period.  Analysts directly questioned Defendants about Canada Goose's outsized inventory growth and wanted to know why inventory levels remained so elevated even after the Company had shipped more products to its wholesale distributors in the quarter than it had the prior year.

51.     Defendants brushed off any concerns about the y-o-y increase in inventory by telling investors that the Company was continuing to "create demand ahead of supply" and increasing inventory "in anticipation of growing customer demand in the fourth quarter of fiscal 2019." Defendants also claimed that the Company was building inventory "in advance of our fiscal year 2020," which allowed them to be "very confident about next year and how we'll be able to continue to deliver growth in future seasons."

52.     In response to the news disclosed on February 14, 2019, the price of Canada Goose stock declined nearly 13%, on 16.6 million shares traded, the highest trading volume the Company's stock had experienced in more than a year.  Canada Goose's stock price would have fallen further had the full truth been revealed.  Instead, Defendants' shifting explanations for the increase in inventory continued to give analysts and investors the misleading impression that the Company would continue to experience increased demand and accelerated growth in line with historical trends. Yet, the very next quarter, Defendants would report 4Q19 revenue that missed analysts' revenue expectations, disclose anemic growth in the DTC segment and reveal that they expected annual revenue growth in FY20 that was *half* of what the Company had reported for the last three years.

**E.    Canada Goose Misses on Revenue Expectations for the First Time
Since the IPO and Reveals that FY20 Revenues Will Grow at Half the
Rate of Prior Years**

53.    On May 29, 2019, Canada Goose announced its financial results for 4Q19 and FY19.
For the quarter, the Company reported revenue of $156.2 million, which fell short of analysts'
consensus of $159 million and marked the *first time* that Canada Goose had missed on analysts'
revenue expectations since becoming a publicly traded company.  The Company also reported 4Q19
DTC revenue of $122.4 million, a y-o-y increase of only 29.1% – significantly *below* analysts'
estimates of 40% DTC revenue growth – in one of the most important quarters for Canada Goose's
DTC channel, despite the opening of five new retail stores during the fiscal year.  Providing
guidance for FY20, the Company then disclosed that it expected annual revenue growth of "at least
20%" or approximately half of what Canada Goose reported in 2017, 2018 and 2019.  During a
conference call that day, Reiss admitted that the Company had shifted its approach from "building
demand ahead of supply" to "building inventory ahead of demand," stating, "this reflects the change
in our model of building demand ahead of supply."

54.    In response to these announcements, the price of Canada Goose stock tumbled, falling
more than 30% on a trading volume of more than 20.4 million shares (six times the previous day's
trading volume).  Analysts and investors were shocked by the Company's revelations, calling the
4Q19 revenue miss "a big surprise given that GOOS has beat top-line every quarter since the IPO by
10% or more" and commenting on the "investor red flags," including "inventory levels [that]
appeared heavy exiting the quarter" and "top-line growth slow down" in the "higher margin DTC
business."

## V.      MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

### A.      First Quarter 2019 Financial Results

55.      On August 9, 2018, Canada Goose filed with the SEC its Form 6-K for the first fiscal quarter ended June 30, 2018 (the "1Q19 6-K").  The Company attached as exhibits to the 1Q19 6-K a press release, also dated August 9, 2018, Consolidated Interim Financial Statements for the Three Months Ended June 30, 2018 and Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three Months Ended June 30, 2018 ("1Q19 MD&A").

56.      For the quarter, the Company reported total revenue of $44.7 million, representing an increase of 58.5% from the prior year, which exceeded analysts' estimates of 29% y-o-y revenue growth.  DTC revenue increased to $23.2 million from $8.3 million and wholesale revenue increased to $21.5 million from $19.9 million.  In addition, Canada Goose reported an adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") loss of $13.5 million – 50% better than analysts' consensus – and an adjusted net loss of $0.16 per share, which was also more favorable than analysts had been expecting.

57.      The Company also reported a gross margin of 64%, an increase from 46.8% (or 1,700 basis points), beating analysts' consensus of an increase of 460 basis points.[5]  Canada Goose attributed the gross margin increase to "a greater proportion of DTC revenue and to a lesser degree, wholesale gross margin expansion."  Canada Goose's DTC gross margin increased from 74.7% the prior year to 76.3%, "primarily driven by product mix and partially offset by unfavorable foreign exchange fluctuations."  As compared to the prior year, the Company's wholesale gross margin

---

[5]      Gross margin is the percentage of revenue that exceeds cost of goods sold.  It shows how well a company is generating revenue from the costs involved in producing their inventory.  The higher the margin, the more effective the company's management is in generating revenue for each dollar of cost.

increased more than 1,500 basis points to 50.7%, with the increase "primarily attributable to a different wholesale mix in the quarter compared to the same quarter last year."

58.     In the press release, Canada Goose reiterated its previously issued outlook for FY19, stating that the Company expected to achieve "[a]nnual revenue growth of at least 20%," "[a]djusted EBITDA margin expansion of at least 50 basis points," and "[a]nnual growth in adjusted net income per diluted share of at least 25%."

59.     Canada Goose's 1Q19 MD&A reported that, for the quarter, the Company's "wholesale segment and DTC segment represented 48.1% and 51.9% of . . . total revenue, respectively," and stated that "[t]he overall shift of sales from the wholesale segment to the DTC segment continued in the first quarter of fiscal 2019, and is expected to continue as we open more retail stores and expand e-commerce access in future years."  It further stated:

> Growth in our DTC channel is expected to alter the current seasonal concentration of our revenue since customers tend to purchase goods in retail stores and on e-commerce sites at a higher rate in our third and fourth fiscal quarters, compared to the wholesale business, where products are delivered to wholesale partners ahead of their peak selling season in the second and third quarters.

60.     Regarding the Company's working capital requirements and inventory levels, the 1Q19 MD&A stated, "[w]orking capital requirements typically increase throughout our first and second fiscal quarters as inventory builds to support our peak shipping and selling period from August to the end of the calendar year."

61.     The Company's 1Q19 MD&A also described the "seasonal fluctuations in wholesale and distributor customer demand," which had "shifted the delivery timing of customer orders between quarters in prior years, and [could] be expected to affect the quarterly pattern of wholesale revenue" in FY19 and in future years.

62.     That same day, Canada Goose hosted a conference call with analysts and investors to discuss the Company's operations and 1Q19 financial results.  In his prepared remarks, defendant Reiss highlighted the DTC channel, which he described as "a standout performer," reporting that the Company's "DTC business increased to 51.9% of total revenue compared to 28.5% last year." Providing an update on the Company's retail stores, including the recently opened stores in Boston, Chicago, Calgary and London, defendant Reiss told investors that Canada Goose was continuing to "**build demand ahead of supply**."

63.     During the call, analysts questioned Defendants about any anticipated impact from "timing shifts" in wholesale, and defendant Sinclair denied there was any "underlying shift in demand," assuring investors that "there's something of a mix going on" and that is "just how customers want to take it."  Analysts also specifically questioned Defendants about timing shifts in the DTC channel, given Defendants' statements that consumers were "buying parkas early," and asked whether investors should expect any impact to the back half of the year in the Company's DTC channel.  Defendant Reiss avoided answering the question, instead stating that he would not "speculate on what is going to happen in the future quarters."

64.     In response to an analyst's question about gross margin opportunities in the DTC and wholesale channels, defendant Sinclair responded, "we've seen good improvement in our DTC gross margin in the quarter – 150 basis points," and "[a]s we look at the margin opportunity for the business, I think you'll see as we see the development of the DTC channel continue, that will alter the mix . . . and, therefore, there will be a mechanical shift in the reported gross margin . . . beyond the natural improvement that one might expect through wholesale."  Defendant Reiss added that the Company's DTC business "has really performed extraordinarily well.  We're really, really happy with it."

- 22 -

65.     Also during the call, a Barclays analyst questioned the Company's decision to allocate more first quarter shipments to North America, as compared to the rest of the world, and specifically asked whether distributors "ended last year with a higher inventory position."  In response, defendant Reiss insisted that there was nothing amiss with the Company's inventory levels, telling investors, "there's nothing to read into – that you're trying to read into there.  There's nothing to read into that."

66.     A Robert W. Baird & Co. analyst specifically called out Canada Goose's inventory position, pointing out, "at least on a year-over-year basis, you've ramped the growth rate and the inventory a little bit in the last few quarters, including Q1 – at the end of Q1" and asked how analysts and investors "should . . . read [into] that," *i.e.*, whether it was a "function of being light on inventory last year" or a "reflection of your sales outlook or other factors at play."  In response, defendant Sinclair stated:

> I think the way to look at the inventory is we're coming out of a quiet quarter. It's our lowest quarter of the year.  We are getting ready for the wholesale shipments that come in Q2 and Q3 and . . . of the business in Q3 and Q4 from a DTC point of view.
>
> So to be honest, it's an entirely natural process.  What's different is that we have all stores coming onstream this year versus last year. ***So ultimately, beyond the business growth, what we're also doing is making sure that inventory is there to meet demand***.

67.     In response to an analyst's question about demand "outpac[ing] supply," defendant Reiss told investors he was "confident" that the Company had "the production capacity to make the units that we're going to need to meet the demand."

68.     Analysts reacted positively to Canada Goose's 1Q19 results.  For example, on August 9, 2018, Canaccord Genuity issued an analyst report commenting on the Company's "strong start to the year, especially in DTC," which "indicates that the company is advantageously positioned for the

- 23 -

upcoming fall/winter season as both product and experiences . . . continue to propel the brand's awareness."

69.     Similarly, on August 9, 2018, Wells Fargo issued a report observing that "[i]n its smallest revenue generating quarter . . . GOOS put up a solid beat with an adjusted EPS loss of $0.16 (ahead of the Street's -$0.22) driven by much better sales (+58.5% vs. the Street's +28%) and [gross margins] (64.0% vs. the Street's 50.6%).  Sales growth was driven by wholesale . . . and DTC growth . . . while [gross margins] expanded due to acceleration in the higher-margin DTC channel." Wells Fargo further reported, "[w]e came away very impressed by GOOS's margin expansion and ability to maintain similar EBITDA losses year-over-year" and stated, "[a]s GOOS ramps its DTC channel . . . [gross margin] should continue to accelerate at elevated levels as the company captures a higher [average unit retail]."

70.     Defendants' statements on August 9, 2018, as set forth above in ¶¶55-67 were materially false or misleading and/or omitted material facts for the following reasons:

(a)     Canada Goose was already experiencing a spike in inventory, including finished goods, which were growing at a faster rate y-o-y than the Company's revenues.  As a result, Defendants were not "building demand ahead of supply," but were building supply, *i.e.*, inventories, ahead of demand.

(b)     Canada Goose's inflated inventory growth and ramp in the production of finished goods gave investors the misleading impression that the Company would continue to experience increasing demand and accelerated growth commensurate with historical trends.  In reality, however, Canada Goose's FY20 revenue was expected to grow at only half the rate that the Company's revenue had grown in prior years.

- 24 -

(c)     Defendants failed to disclose the negative impact resulting from timing shifts in the DTC channel.  Specifically, Defendants failed to disclose that customers in the Company's DTC channel were purchasing higher-margin, heavy weight parkas earlier.  As a result, the Company's 3Q19 and 4Q19 financial results – the most important quarters for the DTC channel – would be negatively impacted.

## B.     Second Quarter 2019 Financial Results

71.     On November 14, 2018, Canada Goose filed with the SEC its Form 6-K for the quarter ended September 30, 2018 (the "2Q19 6-K").  The Company attached as exhibits to the 2Q19 6-K a press release, also dated November 14, 2018, Consolidated Interim Financial Statements for the Three and Six Months Ended September 30, 2018 and Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three and Six Months Ended September 30, 2018 ("2Q19 MD&A").

72.     For the quarter, total revenue increased 33.7% y-o-y to $230.3 million from $172.3 million, exceeding analysts' estimates of 15%-19% y-o-y revenue growth, with DTC revenue increasing to $50.4 million from $20.2 million and wholesale revenue increasing to $179.9 million from $152.1 million.  Adjusted EBITDA increased 53.1% and Canada Goose reported adjusted net income per diluted share of $0.46, an increase of 58.6%.  The Company attributed the increase in wholesale revenue to "higher order values from existing partners, earlier shipment timing relative to last year and favorable foreign exchange rate fluctuations."  According to the press release, DTC revenue increased due to "strong performance of well-established retail stores and e-commerce sites, and incremental revenue from four new retail stores opened in the third quarter of fiscal 2018, were both significant contributors."

73.     The Company also reported a gross margin of 55.8%, an increase from 50.6%, beating analysts' estimates of approximately 52.6%.  Canada Goose attributed the gross margin increase to "a greater proportion of DTC revenue, as well as underlying gross margin expansion at the respective channel levels."  The Company's DTC and wholesale gross margins increased to 75.2% and 50.4%, respectively.

74.     For the first time in FY19, Canada Goose reported y-o-y inventory growth that exceeded its revenue growth.  Specifically, the Company reported that its 2Q19 inventories grew 46.4% y-o-y, while its revenue grew only 33.7% during the same time period.  Additionally, Canada Goose's finished goods inventory increased 51.4% y-o-y.

75.     In the press release, Canada Goose announced that it was revising its FY19 outlook.  The press release stated that "[b]ased on the strength of the performance across the business, with a particularly significant contribution from the DTC channel," Defendants were now expecting "fiscal 2019 results to exceed the outlook which was originally provided with the release of fourth quarter and fiscal year 2018 results on June 15, 2018."  The Company reported that it was expecting "[a]nnual revenue growth of at least 30%" (compared to prior guidance of at least 20%), "[a]djusted EBITDA margin expansion of at least 150 basis points compared to full year fiscal 2018" (compared to prior guidance of at least 50 basis points) and "[a]nnual growth in adjusted net income per diluted share of at least 40%" (compared to prior guidance of 25%).  In the press release, defendant Reiss stated, "'[w]ith such an outstanding first half of the fiscal year, we are in a strong position ahead of our peak selling season.'"

76.     Canada Goose's 2Q19 MD&A reported that "[t]he overall growth in sales along with the increased proportion of sales in the DTC segment continued in the second quarter of fiscal 2019

and is expected to continue as we open more retail stores and expand e-commerce access in future years."  It also reported that:

> Growth in our DTC channel is expected to alter the seasonal concentration of our revenue since customers tend to purchase goods in retail stores and on e-commerce sites at a higher rate in our third and fourth fiscal quarters, compared to the wholesale business, where products are delivered to wholesale partners ahead of their peak selling season in the second and third quarters.

77.     Regarding the Company's working capital requirements and inventory levels, the 2Q19 MD&A stated, "[n]et working capital requirements typically increase throughout our first and second fiscal quarters as inventory builds to support our peak shipping and selling period from August to the end of the calendar year."

78.     The 2Q19 MD&A also described the "seasonal fluctuations in wholesale and distributor customer demand," which had "shifted the delivery timing of customer orders between quarters in prior years" and could "be expected to continue to affect the quarterly pattern of wholesale revenue in fiscal 2019 and in future years."

79.     Also on November 14, 2018, Canada Goose hosted a conference call with analysts and investors to discuss the Company's operations and 2Q19 financial results.  In his prepared remarks, defendant Reiss stated that Canada Goose was "continu[ing] to significantly grow our wholesale business alongside the great success of our direct-to-consumer channel."  Defendant Reiss further emphasized that the Company's "execution in the first half of fiscal 2019 was exceptional," putting Canada Goose in "an amazing position going into our peak selling season.  Operational and financial performance in both channels has been outstanding . . . ."

80.     During the call, defendant Sinclair described the wholesale channel as a "standout performer in a largest quarter for wholesale shipments in the fiscal year."  Defendant Sinclair further

stated that, "[i]n response to customer requests, we fulfilled a higher proportion of our total season full winter order book in this quarter relative to last year."

81.     Defendant Sinclair closed his prepared remarks by stating, "[f]inancially and operationally, we are entering our peak selling season from a real position of strength, and we are excited, optimistic and confident about the remainder of the year."

82.     During the call, analysts questioned Defendants about the shift in wholesale timing in 2Q19 and "how that impacts the second half of the year."  In response, defendant Sinclair explained that "there is a lower level of unfulfilled orders going into the third quarter," but assured investors that it was a "temporary timing factor."

83.     Analysts also specifically questioned Defendants about the Company's inventory. For example, an analyst from RBC Capital Markets observed, "last year at this time, entering the second half, inventories were only up to 8%, and I think this year, they're up 46%."  The analyst asked whether "that changes your ability to chase demand at all . . . into the back half," or whether it was due to "timing shifts on store openings."  In response, defendant Sinclair acknowledged the Company's "very healthy level of inventory," but attributed the growth to the Company having "11 stores by the end of this quarter compared to 5 last year, [and] 12 websites compared to 11 last year." Defendant Sinclair also reassured investors that the Company's inventory was "consistent with the sorts of levels of revenue growth and network growth that we're talking about."

84.     Also during the call, a Goldman Sachs analyst asked whether the Company was doing anything to ensure that Canada Goose's retail partners had enough product for the upcoming holiday season in light of the fact that the Company's products had sold out in prior years.  Defendant Reiss responded, "I think that the scarcity factor that exists with our brand is because of the demand that exists in the marketplace.  And we're very happy with the growth rates that – in the rate in which our

- 28 -

business is growing.  Top line and bottom line, we're happy with all of that."  Conceding that "there's more inventory available this year," defendant Reiss also attributed the elevated inventory levels to more "brick[]-and-mortar stores this year" which he claimed required more inventory.

85.     Analysts reacted positively to Canada Goose's 2Q19 results and believed Defendants' reassurances that the Company's growing inventories were "healthy" and of no concern.  For example, in an analyst report dated November 14, 2018, Evercore stated that it viewed "[i]nventory +46%" as "more of an opportunity than a risk for this brand that encountered stock-outs last winter in virtually all of its channels.  And it looks like most of this inventory is earmarked for the higher-margin DTC business given that the wholesale shipments went out earlier this year."

86.     A November 15, 2018 Barclays analyst report commented that "GOOS turned in another strong quarter, beating on almost all key metrics: revenue +34% (above our 24% forecast, driven by early wholesale fulfillment), gross margin +525bps (ahead of our +149 bps forecast, attributable to production efficiencies and CETA)" and "EBITDA of $71mln (+53% y/y) was 45% ahead of our forecast ($49mln) and 61% ahead of consensus ($44mln)."  The Barclays report also highlighted the increasing importance of Canada Goose's DTC channel, stating, "[w]ith the bulk of wholesale shipments completed in 1H and a growing DTC presence, GOOS's 2H has become increasingly about DTC performance."

87.     Defendants' statements on November 14, 2018, as set forth above in ¶¶71-84, were materially false or misleading and/or omitted material facts for the following reasons:

(a)     Defendants were not "building demand ahead of supply," but were building supply, *i.e.*, inventories, ahead of demand.

(b)     Canada Goose's inflated inventories and ramp in the production of finished goods gave investors the misleading impression that the Company would continue to experience

- 29 -

increasing demand and accelerated growth commensurate with historical trends.  For example, defendant Sinclair reassured investors that the Company's inventory was "consistent with the sorts of levels of revenue growth and network growth that we're talking about."  In reality, however, Canada Goose's FY20 revenue was expected to grow at only half the rate that the Company's revenue had grown in prior years.

    (c)  Defendants failed to disclose the negative impact resulting from timing shifts in the DTC channel.  Specifically, Defendants failed to disclose that customers in the Company's DTC channel were purchasing higher-margin heavy weight parkas earlier.  As a result, the Company's 3Q19 and 4Q19 financial results – the most important quarters for the DTC channel – would be negatively impacted.

    **C.**  **Third Quarter 2019 Financial Results**

    88.  On February 14, 2019, Canada Goose filed with the SEC its Form 6-K for the quarter ended December 31, 2018 (the "3Q19 6-K").  The Company attached as exhibits to the 3Q19 6-K a press release, also dated February 14, 2019, Consolidated Interim Financial Statements for the Three and Nine Months Ended December 31, 2018 and Management's Discussion and Analysis of Financial Condition and Results of Operations for the Three and Nine Months Ended December 31, 2018 ("3Q19 MD&A").

    89.  Canada Goose reported total revenue of $399.3 million, which the Company disclosed was due to a higher proportion of customers purchasing "product earlier in the second half of fiscal 2019 relative to the same period last year."  Although total revenues for the quarter increased by 50.2%, the Company reported gross margin ***declines*** in both the wholesale and DTC channels, blaming "higher labour costs due to the onset of Ontario's minimum wage increase," although the minimum wage increase had gone into effect an entire year earlier, "at the start of the

- 30 -

2018 calendar year."  Furthermore, the Company's gross margins increased **only 1%** y-o-y, even though the higher-margin DTC channel comprised 58.9% of total revenue in the quarter.

90.     And for the second consecutive quarter, Canada Goose reported inventory growth that exceeded revenue growth, reporting a 74.5% y-o-y spike in inventory compared to a 50.2% y-o-y increase in revenue.  The Company's finished goods inventories grew 85.7% in the same period.

91.     Despite the y-o-y gross margin declines in the wholesale and DTC channels and the second consecutive quarter of inventory growth that outpaced revenue growth, in the press release the Company announced that it was raising its FY19 outlook.  Specifically, Canada Goose reported that it was expecting "[a]nnual revenue growth in the mid-to-high thirties on a percentage basis, compared to at least 30%," "[a]djusted EBITDA margin expansion of at least 150 basis points compared to fiscal 2018" which was unchanged from 2Q19 and "[a]nnual growth in adjusted net income per diluted share in the mid-to-high forties on a percentage basis, compared to at least 40%." Canada Goose's revised FY19 guidance assumed "[w]holesale revenue growth in the mid-to-high teens on a percentage basis."

92.     Canada Goose's 3Q19 MD&A stated that "[t]he overall growth in sales along with the increased proportion of sales in the DTC segment is expected to continue as we open more retail stores and expand e-commerce access in future years."  It further reported:

> Growth in our DTC channel is expected to continue to alter the seasonal concentration of our revenue since customers tend to purchase goods in retail stores and on e-commerce sites at a higher rate in our third and fourth fiscal quarters, compared to the wholesale business, where products are delivered to wholesale partners in the second and third quarters ahead of their peak selling season.

93.     Regarding the Company's working capital requirements, cash flows and inventory levels, the 3Q19 MD&A stated, "working capital requirements typically increase throughout our first and second fiscal quarters as inventory builds to support our peak shipping and selling period

beginning in the second quarter, to the end of the calendar year."  It also stated that "[t]he decrease

. . . in cash inflows from operating activities" for 3Q19 was primarily due to an "increase in funds

. . . used to acquire inventory . . . *in anticipation of growing customer demand in the fourth quarter*

*of fiscal 2019*."

94.     The 3Q19 MD&A also provided additional details on the Company's gross margin

declines.  Specifically, the y-o-y decrease in wholesale gross margins was due in part to "changes in

product mix" while the decrease in DTC gross margins was also due to "a shift in product mix, with

a higher proportion of lightweight down jacket sales" – implying that Canada Goose sold

proportionally less of its more expensive, higher-margin, heavy parkas during its peak winter and

holiday season (*i.e.*, October through December 2018).

95.     That same day, Canada Goose hosted a conference call with analysts and investors to

discuss the Company's operations and 3Q19 financial results.  In his prepared remarks, defendant

Reiss once again told investors that the Company was continuing to "*create demand ahead of*

*supply*."  Defendant Reiss also extolled the "strength" of the Company's DTC and wholesale

channels, which both "outperformed" in the quarter.  He closed his prepared remarks by stating,

"[o]ur brand and products continue to resonate globally, both channels are going from strength to

strength and we have made massive progress expanding in-house capacity.  We're really excited –

we are excited about next year as well and we remain deeply committed to our long-term vision."

96.     Discussing the Company's 3Q19 financial results, defendant Sinclair stated that the

Company's "DTC channel led the way" with revenue increasing 59% to $235.3 million, up from

$131.7 million the prior year.  Wholesale revenue grew 22% to $164 million, which defendant

Sinclair said was due to "higher order values from existing partners and earlier shipment timing."

He further stated that, for the quarter, the Company "fulfilled a higher proportion of our order book

- 32 -

and reorder allocations relative to last year."  Defendants then disclosed, for the first time, that the

Company was experiencing "significantly more purchasing occurring earlier" in both the wholesale

and DTC channels.  As a result of the timing shifts, Defendants cautioned investors to expect "a

naturally lower rate of speed in both channels through the remainder of the fiscal year."  But

Defendants nevertheless reiterated the Company's revised FY19 guidance.

97.     During the call, an analyst from Credit Suisse sought clarification on the Company's

74.5% y-o-y increase in inventory:

> I'm a little confused when I look at the inventory up 75%, but you said, sales were
> pulled significantly forward within the second half of your fiscal year.  It seems like
> there's quite a bit of inventory ready for the fourth quarter, but you're saying the
> growth rate's a little slow on a rate basis, maybe you can help just reconcile those
> [two]?

98.     Defendant Sinclair responded by dismissing concerns about the Company's massive

y-o-y spike in inventory, stating, "we produce our inventory on a linear basis ahead of the planned

growth for future seasons . . . and for future years" and claiming that "what you see now is an

inventory being built in advance of our fiscal year 2020."

99.     Defendant Reiss added:

> [I]n terms of inventory, we're right where we want to be.  We're happy with where
> we're positioned and a lot of it, as [Sinclair] mentioned, is for next year and also to
> point out that we do have more stores so – and having more stores, by definition, we
> need more inventory to fill those stores and that also adds to the increased inventory
> level.

100.     In response to a question from an Evercore analyst about the allocation of inventory

between the wholesale and DTC channels, particularly in light of the Company's expanding

manufacturing capabilities, defendant Sinclair stated, "we have ample inventory to meet the demand

both in wholesale and DTC.  And you've seen us do that through this year.  ***You've seen us building***

*inventory this year, that allows us to be very confident about next year and how we'll be able to continue to deliver growth in future seasons*."

101.     In a follow-up question, the Evercore analyst asked whether it was "fair to say that some of the inventory build at the end of the quarter" could be sold now, but that Canada Goose was building inventory for next year.  In response, defendant Reiss claimed that the Company's increase in inventory was in anticipation of FY20, stating, "we start building inventory for next year even in the season."

102.     Also during the call, an analyst from CIBC Capital Markets asked how Canada Goose would characterize the opportunities going forward for "refining both your mix of wholesale partners and how those partners support your brand," to which defendant Reiss responded, "we're really happy with the performance of wholesale this year.  *And from what we've seen for – our early indications for our wholesale order book next year, we're really happy with that as well*."

103.     On this news, the price of Canada Goose common stock tumbled, falling nearly 13%, or $7.66 USD per share, from a closing price of $59.19 USD per share on February 13, 2019 to $51.53 USD per share on February 14, 2019.

104.     Analysts and investors were surprised by the Company's results, including the y-o-y declines in both DTC and wholesale gross margins, the 74.5% y-o-y increase in inventories and the Company's revised FY19 guidance, all of which implied decelerating growth in the DTC and wholesale channels for 4Q19.

105.     For example, on February 14, 2019, Wells Fargo issued an analyst report commenting, "while top-line and EBIT beat handily, [gross margins] actually missed for the first time, and by a wide margin (300bps below the Street) – as [gross margins] in both DTC and wholesale declined YoY."  The report also flagged the Company's inventory, questioning

- 34 -

management's statements on the call that they were "comfortable" with the outsized inventory growth, and stating that Canada Goose's 3Q19 inventory was "very high even for a company growing top-line 40%+."

106.    A February 21, 2019 RBC Capital Markets analyst report commented on the "13% selloff" following the news disclosed on February 14, 2019, which was "due to investor concerns that GOOS's hyper-growth trajectory and margin expansion story were coming down to earth after their meteoric rise."  The report noted that investors were specifically focused on "inventory growth of 75% despite 4Q top-line guidance for deceleration to the mid-teens."  The RBC Capital Markets report also commented that "[o]n gross margins, investors were surprised by the miss."

107.    The price of Canada Goose common stock would have fallen further had Defendants revealed the true condition of the Company.  Instead, Defendants continued to mislead investors. For example, although Defendants hinted that the Company could experience a "lower rate of speed in both channels through the remainder of the fiscal year," Defendants assured investors that Canada Goose was building up inventory "*in anticipation of growing customer demand in the fourth quarter of fiscal 2019*."  Similarly, when asked about the Company's increasingly elevated inventory, Defendants told investors, "[y]ou've seen us building inventory this year, that allows us to be very confident about next year *and how we'll be able to continue to deliver growth in future seasons*."

108.    Defendants' statements on February 14, 2019, as set forth above in ¶¶88-102, were materially false or misleading and/or omitted material facts for the following reasons:

(a)    Defendants were not "building demand ahead of supply," but were building supply, *i.e.*, inventories, ahead of demand.

(b)     Although Defendants partially disclosed that timing shifts in the DTC channel could impact the Company's 4Q19 financial results – one of the most important quarters for the DTC channel – they failed to disclose the full, negative impact.

(c)     Canada Goose's inflated inventories and ramp in the production of finished goods gave investors the misleading impression that the Company would continue to experience increased demand and accelerated growth commensurate with historical trends.  As an example, Defendants told investors, "[y]ou've seen us building inventory this year, that allows us to be very confident about next year and how we'll be able to continue to deliver growth in future seasons."  In reality, Canada Goose's FY20 revenue was expected to grow at only *half* the rate that the Company's revenue had grown in prior years, including wholesale growth in the mid-single-digits.

## VI.     THE TRUTH EMERGES

109.    Before the market opened on May 29, 2019, Canada Goose announced its financial results for the fourth quarter and fiscal year ended March 31, 2019.  As disclosed in the Company's 2019 20-F, for 4Q19 the Company reported revenue of $156.2 million, which grew by just 25% y-o-y and fell short of analysts' expectations of $159 million or 27% y-o-y growth.  This marked the first time Canada Goose *missed* on analysts' revenue expectations since becoming a publicly traded company.  The Company also reported 4Q19 DTC revenue of $122.4 million, an increase of only 29.1% y-o-y in one of the most important quarters for the DTC segment, significantly *below* analysts' estimates of 40% DTC revenue growth.  The Company's earnings before interest and taxes ("EBIT") margin also declined by approximately 4.4% y-o-y.  Additionally, the Company reported just a 290 basis points increase in gross margins y-o-y, despite the fact that revenue from the higher-margin DTC channel accounted for 78.4% of the Company's total revenues in the quarter.  The

Cases\4829-4027-5636.v1-2/18/20

Company also reported anemic DTC gross margin growth of only 170 basis points due in part to "a seasonal shift in product mix, with a higher proportion of lightweight down jacket sales."

110.    In the press release, Canada Goose provided guidance for FY20.  After three consecutive years of reporting an approximately 40% compounded annual growth rate, the Company shocked investors by significantly lowering its expectations for FY20.  Specifically, Canada Goose disclosed that for FY20, the Company expected "[a]nnual revenue growth of at least **20%**," **half** of what the Company had reported for the prior three years, "[a]djusted EBIT margin expansion of at least 40 basis points" and "[a]nnual growth in adjusted net income per diluted share of at least 25%." And after reporting wholesale growth of 19% in FY19, the Company further disclosed that it expected wholesale growth in just the "**high-single-digits** on a percentage basis" for FY20.

111.    Defendants held a conference call before the market opened to discuss the Company's operations, 4Q19/FY19 financial results and FY20 guidance.  During the call, an analyst from Evercore pointed out that the Company appeared to be "building inventory more aggressively earlier in the season for the winter ahead" and asked whether there had been a "philosophical and operational shift around the [Company's] approach to inventory."  Defendant Reiss revealed that the Company had indeed shifted its approach from "building demand ahead of supply" to "building inventory ahead of demand" and admitted that "this reflects the change in our model of building demand ahead of supply."

112.    A Bank of America Merrill Lynch analyst questioned Defendants about the Company's DTC channel, which grew only 29% in 4Q19, despite Canada Goose doubling its retail stores as compared to the prior year and entering the quarter "with a very strong inventory position":

> And so I'm just mathematically to get to only a 29%, I have to either assume that the stores you opened last year are comping negative or your dotcom business slowed pretty significantly from the growth that it was generating.  Can you just help us

- 37 -

think about how the D[T]C [channel] wasn't stronger given everything heading into the quarter?

113.    In response, defendant Sinclair admitted that the significantly lower-than-expected DTC revenue growth was the result of "earlier consumer purchasing of full winter product versus the previous year."

114.    On this news, shares of Canada Goose stock tumbled, falling $15.13 USD per share or 30.9%, to close at $33.89 USD per share on May 29, 2019.

115.    Analysts and investors were shocked by the Company's revelations on May 29, 2019, including Canada Goose's 4Q19 revenue miss, sluggish DTC revenue growth in one of the segment's most important quarters and the Company's FY20 guidance of "at least 20%" annual revenue growth, which was significantly below analysts' estimates of 26% growth.

116.    Analysts also reacted negatively to Defendants' revelations.  For example, in an analyst report dated May 29, 2019, Credit Suisse questioned why the Company did not achieve better growth in 4Q19, as Canada Goose should have benefitted from a "significant" international/China rollout in addition to "5 incremental stores that GOOS claims have similar productivity dynamics to legacy stores, cold weather through the quarter, and category extensions."

117.    In an analyst report dated May 29, 2019, Wells Fargo stated that the Company's 4Q19 results marked the second straight quarter that raised "investor red flags" and expressed its "concern" that Canada Goose's "DTC segment's growth seems to be moderating (despite faster square footage growth) – implying negative store comps."  The Wells Fargo report noted that Canada Goose's 4Q19 revenue miss was "a big surprise given that GOOS has beat top-line every quarter since the IPO by 10% or more (the average top-line beat has been over 25%)."  The Wells Fargo report further commented that Canada Goose's 3Q19 miss on gross margins "has raised questions around the margin direction of the business" and observed that the gross margins miss

- 38 -

"came at the same time that 1) inventory levels appeared heavy exiting the quarter (+74% YoY on 50% sales growth) and 2) their higher margin DTC business has seen top-line growth slow down."

118.    Similarly, in an analyst report dated May 29, 2019, Evercore stated that "the key challenge for investors" is "reconciling the slowing DTC growth (+29% from +79%) in the second largest DTC quarter with the still elevated inventory +61%."

119.    In an analyst report dated May 30, 2019, TD Securities Inc. commented on the "below . . . expectations" DTC revenue and FY20 guidance and stated, "[c]ombined with the modest shortfall in revenue and inventory build in Q4, we believe that this prompted the negative share price reaction yesterday."

120.    As a result of Defendants' wrongful acts and material omissions, as well as the precipitous decline in the market value of Canada Goose stock as the artificial inflation was removed, Plaintiff and other Class members suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

121.    The following additional facts, when considered collectively with those alleged elsewhere herein, support a strong inference that Defendants knowingly made materially false or misleading statements and/or omissions, or acted recklessly in doing so during the Class Period.

122.    Defendants were motivated to maintain the market's perception that Canada Goose was a "hyper growth" company.  Defendant Reiss, in particular, was motivated to maintain the Company's growth trajectory and the artificially inflated price of Canada Goose stock given that he owned approximately 35.5% of the Company's multiple voting shares as of the beginning of the Class Period.  Thus, as Canada Goose's stock price soared during the Class Period (and prior to the Company's partial disclosure on February 14, 2019), so did defendant Reiss's personal wealth, which was estimated at around $1.3 billion USD as of March 2019.

123.     The massive and suspiciously timed insider stock sales by defendant Reiss and the Bain Capital Entity Defendants also support a strong inference of scienter.  On or around November 29, 2018, approximately one month before the close of Canada Goose's 3Q19 and while the Company's shares were trading near an all-time high, defendant Reiss and the Bain Capital Entity Defendants took advantage of the artificial inflation in the price of Canada Goose stock by selling a total of 10 million shares in the Selling Shareholders Offering (including "gifted" shares).

124.     Specifically, defendant Reiss sold 1.5 million shares of his Canada Goose common stock holdings.  The price at which defendant Reiss sold his stock ($64.52 USD per share) on or around November 29, 2018, far exceeded the closing price of Canada Goose stock after the Company announced its financial results for 3Q19 less than three months later (*i.e.*, $51.53 USD per share on February 14, 2019).  As a result of his sale, defendant Reiss reaped profits of nearly ***$97 million USD***, ***more than 100 times his FY19 salary***.  This stock sale was suspicious in timing and amount because: (1) defendant Reiss made this sale when he was aware (or was reckless in not knowing) that he and the Company's CFO, defendant Sinclair, were misleading investors about the Company's future growth prospects by, among other things, assuring investors that Canada Goose was "building demand ahead of supply" and that the Company's outsized inventory growth reflected "planned growth" for "future years" and "inventory being built in advance of our fiscal year 2020"; (2) defendant Reiss unloaded these shares just over a month before the close of Canada Goose's 3Q19 and only a few months before the Company's partial disclosure on February 14, 2019; and (3) defendant Reiss made this sale at a time when Canada Goose's stock price was near its all-time high.

125.     Like defendant Reiss, the Bain Capital Entity Defendants sold millions of shares on or around November 29, 2018 at a price of $64.52 USD per share – just over a month before the close of Canada Goose's 3Q19 – while the Company's stock price was trading at nearly an all-time

- 40 -

high.  Specifically, the Bain Capital Entity Defendants sold more than 7.4 million shares for proceeds exceeding $477 million USD.  This stock sale was suspicious in timing and amount because: (1) the Bain Capital Entity Defendants made this sale when they – through representatives who were members of Canada Goose's Board of Directors – were aware (or were reckless in not knowing) that the Company's CEO and CFO were misleading investors about the Company's future growth prospects by, among other things, assuring investors that Canada Goose was "building demand ahead of supply" and that the Company's outsized inventory growth and ramp in the production of finished goods reflected "planned growth" for "future years" and "inventory being built in advance of our fiscal year 2020"; (2) the Bain Capital Entity Defendants unloaded their shares just over a month before the close of Canada Goose's 3Q19 and only a few months before the Company made its first partial disclosure of the concealed truth on February 14, 2019; (3) through this sale, the Bain Capital Entity Defendants sold more than 19% of their holdings of Canada Goose stock; and (4) the Bain Capital Entity Defendants made this sale at a time when Canada Goose's stock price was near its all-time high.

126.    The importance of the DTC segment to Canada Goose's operations, financial results and continued growth also supports an inference of scienter.  Leading up to and during the Class Period, Canada Goose was deliberately shifting from a wholesale-heavy to a retail-driven brand. Indeed, one of the Company's stated growth strategies was to "continue growing revenue from existing e-commerce operations and retail stores, while further expanding our footprint in our most important markets."  Additionally, as a result of the seasonality of the Company's products, it typically realized a significant portion of its annual DTC revenues in just two quarters – the third and fourth fiscal quarters.  For example, DTC revenue for the third fiscal quarter of 2018 ("3Q18") and

4Q18 comprised 88.8% of total DTC revenue for the year and 38.3% of total company FY18 revenue.

127.    Given the importance of the DTC channel and the fact that the Company had just 11 retail stores and 12 e-commerce sites in operation during the Class Period, it is reasonable to infer that Defendants were closely monitoring the DTC segment, including any changes in consumer buying patterns that had the potential to impact the critical third and fourth fiscal quarters. Additionally, Canada Goose had an in-house insights team specifically dedicated to continually monitoring a wide range of data related to the Company's brand in all of its key markets. Defendants used that data as an input in both its tactical and strategic decision making. Canada Goose also collected detailed data about its customers through online activities and other customer interactions with the Company. It is therefore reasonable to infer that Defendants were aware of or recklessly disregarded the timing shifts taking place in the DTC channel and the negative impact to that segment's critical third and fourth fiscal quarters.

128.    Defendants' admitted visibility into Canada Goose's wholesale book orders further supports an inference of scienter. As Defendants stated throughout the Class Period, the Company's wholesale "fall/winter and spring order books are set down to the color [and] style . . . well in advance," which gives Defendant "great" "visibility into expected future revenues, with a majority of [wholesale] orders received before the end of the prior fiscal year." In other words, Defendants "[knew] the wholesale order book for all seasons" and received the majority of wholesale orders for FY20 *before* the end of FY19, rendering their statements on February 14, 2019 that "our early indications for our wholesale order book next year, we're really happy with that as well" false or misleading when made. The very next quarter, Defendants shocked investors by disclosing that they

only expected wholesale revenues in the high-single-digits in FY20 (down from the 19% wholesale growth reported in FY19).

129.    The timing of Defendants' statements and subsequent revelation of the truth is also indicative of scienter.  For example, on February 14, 2019, Defendants reported that the Company was acquiring inventory "in anticipation of growing customer demand in the fourth quarter of fiscal 2019."  Additionally, when explicitly questioned about the 74.5% y-o-y growth in inventory in 3Q19, particularly in light of the fact that Canada Goose purportedly "fulfilled a higher proportion of our order book and reorder allocations" in the quarter "relative to last year," Defendants reassured investors that the Company had "ample inventory to meet the demand both in wholesale and DTC. And you've seen us do that through this year.  You've seen us building inventory this year, that allows us to be very confident about next year and how we'll be able to continue to deliver growth in future seasons."  Yet, the very next quarter, Defendants would report revenue growth of just 29% in the DTC segment.  Defendants would also disclose that the Company expected revenue growth in FY20 that was half of what Canada Goose had reported in the three years prior.

130.    The allegations above also establish a strong inference that Canada Goose as an entity acted with corporate scienter throughout the Class Period, as its officers, management and agents, including, but not limited to, the Individual Defendants, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were made knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Canada Goose's true operating condition and present and expected financial performance from the investing public.  By concealing these material facts from investors,

- 43 -

Canada Goose maintained and/or increased its artificially inflated common stock prices throughout the Class Period.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

131.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Canada Goose common stock and operated as a fraud or deceit on Class Period purchasers of Canada Goose common stock by failing to disclose and/or misrepresenting the adverse facts detailed herein.  When the Company's true condition was disclosed to the market, the price of Canada Goose common stock fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of Canada Goose common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

132.    By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Canada Goose's business and prospects.  Defendants' materially misleading statements and omissions had the intended effect and caused Canada Goose common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $70.05 USD per share on November 16, 2018.

133.    On February 14, 2019, before the market opened, Defendants surprised investors when the Company announced its 3Q19 financial results, specifically the y-o-y gross margin declines in both the DTC and wholesale segments, y-o-y inventory growth that outpaced revenue growth in the same period and revised FY19 guidance that implied decelerating growth in the DTC and wholesale channels for 4Q19.  In response to this news, the price of Canada Goose's common stock plummeted approximately 13% on more than four times the previous day's trading volume,

from a closing price of $59.19 USD per share on February 13, 2019, to close at $51.53 USD per share on February 14, 2019.

134.    On May 29, 2019, before the market opened, Canada Goose shocked investors when it announced its 4Q19 and FY19 financial results and provided guidance for FY20.  The Company reported revenue for 4Q19 that fell short of analysts' consensus and marked the first time Canada Goose had missed on analysts' expectations for revenue since becoming a publicly traded company in March 2017.  For 4Q19, the Company also reported: (1) y-o-y DTC revenue growth that was significantly below analysts' estimates; (2) an EBIT margin that declined y-o-y by 4.4%; (3) a gross margins increase of only 5% despite the fact that revenue from the higher-margin DTC channel comprised 78.4% of the Company's total revenues in the quarter; and (4) anemic DTC gross margin growth of only 3% due in part to "a seasonal shift in product mix, with a higher proportion of lightweight down jacket sales."  Further, the Company also revealed that for FY20, it expected revenue growth of "at least 20%" – half of what the Company had reported for the three years prior, along with EBIT margin expansion of 40 basis points, adjusted earnings per diluted share of "at least 25%" and wholesale revenue growth "in the high-single-digits."

135.    In response to this news, the price of Canada Goose's common stock plummeted, falling over 30% on more than six times the previous day's trading volume, from a closing price of $49.02 USD per share on May 28, 2019, to a close of $33.89 USD per share on May 29, 2019.

136.    The precipitous decline in the price of Canada Goose's common stock on February 14, 2019 and May 29, 2019 was a direct result of the nature and extent of the Company's true condition being revealed to investors and the market.  The timing and magnitude of the decline in the price of Canada Goose common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry

- 45 -

factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Canada Goose common stock and the subsequent significant decline in the value of Canada Goose common stock when the true condition of the Company was revealed.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE AND *AFFILIATED UTE* DOCTRINE

137.    At all relevant times, the market for Canada Goose stock was an efficient market for the following reasons, among others:

(a)     Canada Goose common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Canada Goose filed periodic public reports with the SEC and the NYSE;

(c)     Canada Goose regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Canada Goose was followed by numerous securities analysts employed by major brokerage firms, including Barclays Capital Inc., Wells Fargo Securities, LLC, RBC Capital Markets, Credit Suisse, CIBC Capital Markets, TD Securities, Inc., Cowen and Company, Canaccord Genuity, Evercore ISI, BMO Capital Markets and Susquehanna Financial Group, LLP, who wrote reports which were distributed to those brokerage firms' sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

- 46 -

138.    As a result of the foregoing, the market for Canada Goose stock promptly digested current information regarding Canada Goose from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Canada Goose stock during the Class Period suffered similar injury through their purchase of Canada Goose stock at artificially inflated prices, and a presumption of reliance applies.

139.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Canada Goose's business and prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

140.    Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

## X.    NO SAFE HARBOR

141.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements alleged herein.  Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

- 47 -

142.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Canada Goose who knew that the statement was false when made.  Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material, adverse facts undermining such disclosures.

## XI.    CLASS ACTION ALLEGATIONS

143.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased Canada Goose stock during the Class Period, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

144.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Canada Goose stock was actively traded on the NYSE. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that the number of Class members is at least in the thousands and that they are geographically dispersed.  Record owners and other members of the Class may be identified from records maintained by Canada Goose or its transfer agent and may be notified of the pendency of

- 48 -

this action by mail, using the form of notice similar to that customarily used in securities class actions.

145.    Plaintiff's claims are typical of the claims of the other members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

146.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

147.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

148.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

- 49 -

(e)      whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(f)      whether the market prices of Canada Goose stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)      whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## COUNT I
### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Canada Goose and the Individual Defendants

149.    Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

150.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or deliberately disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

151.    Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period.

152.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Canada Goose stock.  Plaintiff and the Class would not have purchased Canada Goose stock at the prices they paid, or at all, if they had been

- 50 -

aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

153.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Canada Goose stock during the Class Period.

### COUNT II
### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants and the Bain Capital Entity Defendants

154.     Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

155.     The Individual Defendants and the Bain Capital Entity Defendants acted as controlling persons of Canada Goose within the meaning of §20(a) of the Exchange Act.

156.     By virtue of their high-level positions as officers and/or directors of Canada Goose and/or their substantial ownership of Canada Goose stock, participation in, awareness of and ability to control the Company's policies and operations and/or their intimate knowledge of the false or misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants and the Bain Capital Entity Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants and the Bain Capital Entity Defendants (either directly or through their representatives on Canada Goose's Board of Directors) were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were

- 51 -

issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

157.     As set forth in ¶¶30-34, the Bain Capital Entity Defendants further controlled Canada Goose by virtue of their share ownership, power to elect and remove directors from the Board of Directors, and ability to approve significant corporate transactions.  Further, as Canada Goose admitted in its 2019 20-F, even if the ownership of the Bain Capital Entity Defendants fell below 50% of the voting power of the Company's outstanding voting shares (and at no time during the Class Period did it do so), "Bain Capital will continue to be able to strongly influence or effectively control our decisions."

158.     As set forth above, Canada Goose and the Individual Defendants violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, and as a result, of their aforementioned conduct, the Individual Defendants and the Bain Capital Entity Defendants are liable pursuant to §20(a) of the Exchange Act for the §10(b) violation alleged herein.  As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Canada Goose stock during the Class Period.

159.     By reason of such conduct, the Individual Defendants and the Bain Capital Entity Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Counsel as Class Counsel;

- 52 -

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  February 18, 2020                       ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
                                                SPENCER A. BURKHOLZ
                                                MATTHEW I. ALPERT
                                                ALEXI H. PFEFFER-GILLETT


                                                    s/ MATTHEW I. ALPERT
                                                  MATTHEW I. ALPERT

                                                655 West Broadway, Suite 1900
                                                San Diego, CA  92101
                                                Telephone:  619/231-1058
                                                619/231-7423 (fax)
                                                spenceb@rgrdlaw.com
                                                malpert@rgrdlaw.com
                                                agillett@rgrdlaw.com

                                                ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
                                                SAMUEL H. RUDMAN
                                                ERIN W. BOARDMAN
                                                58 South Service Road, Suite 200
                                                Melville, NY  11747
                                                Telephone:  631/367-7100
                                                631/367-1173 (fax)
                                                srudman@rgrdlaw.com
                                                eboardman@rgrdlaw.com

- 53 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
MAUREEN E. MUELLER
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
mmueller@rgrdlaw.com

Lead Counsel for Lead Plaintiff

O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE III
JOHN M. McINTIRE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
202/362-2640 (fax)
lmalone@odonoghuelaw.com
jmcintire@odonoghuelaw.com

Additional Counsel for Lead Plaintiff

- 54 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on February 18, 2020, I authorized the

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ MATTHEW I. ALPERT
MATTHEW I. ALPERT

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  malpert@rgrdlaw.com

# Mailing Information for a Case 1:19-cv-08204-VSB Cheng v. Canada Goose Holdings Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew I. Alpert**
  MAlpert@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com,MAlpert@ecf.courtdrive.com

- **Erin Whitney Boardman**
  eboardman@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Spencer A. Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Martin Jonathan Crisp**
  martin.crisp@ropesgray.com,courtalert@ropesgray.com,Deanna.Minasi@ropesgray.com

- **William Scott Holleman**
  holleman@bespc.com,ecf@bespc.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Maureen Elizabeth Mueller**
  mmueller@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Alexi Pfeffer-Gillett**
  agillett@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`