UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

LI HONG CHENG, Individually and on Behalf :    Civil Action No. 1:19-cv-08204-VSB
of All Others Similarly Situated,              :

                                  :    <u>CLASS ACTION</u>
               Plaintiff,     :

                                  :    PLAINTIFF'S OPPOSITION TO
    vs.                    :    DEFENDANTS' AND THE BAIN
                                  :    DEFENDANTS' MOTION TO DISMISS
CANADA GOOSE HOLDINGS INC., et al.,   :    THE AMENDED CLASS ACTION
                                  :    COMPLAINT
            Defendants.   :

                                  :

———————————————————————— x

4836-1856-3777.v1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...............................................................................................1

II.   FACTUAL SUMMARY ......................................................................................3

III.  ARGUMENT.......................................................................................................6

      A.    Legal Standard ........................................................................................6

      B.    The CAC Adequately Pleads Actionable Misstatements and Omissions ................7

      C.    Defendants' Statements Are Not Protected by the PSLRA Safe Harbor...............12

      D.    Defendants' Material Misstatements Are Neither Inactionable Corporate
            Puffery nor Opinions..............................................................................14

      E.    The CAC Sufficiently Alleges a Strong Inference of Scienter .............................19

            1.    The Individual Defendants' Positions, Access to Data and Public
                  Statements to Investors Support an Inference of Scienter .........................20

            2.    The More than $570 Million USD in Insider Trading Supports an
                  Inference of Scienter .................................................................................22

            3.    Defendants' Scienter Is Also Supported by the Close Proximity
                  Between Their Material Misstatements in February 2019 and the
                  Ultimate Corrective Disclosure in May 2019 ...........................................27

      F.    The CAC Sufficiently Alleges Violations of §20(a)............................................28

IV.   CONCLUSION.................................................................................................29

4836-1856-3777.v1

## TABLE OF AUTHORITIES

**Page**

### CASES

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
615 F. App'x 44 (2d Cir. 2015) .......................................................................................21

*Arnlund v. Deloitte & Touche LLP*,
199 F. Supp. 2d 461 (E.D. Va. 2002) ..............................................................................27

*Asher v. Baxter Int'l, Inc.*,
377 F.3d 727 (7th Cir. 2004) ...........................................................................................25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...............................................................................................28

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008)..............................................................23, 26

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019)...............................................................................26

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. 2012) ...........................................................................22

*Christine Asia Co. Ltd. v. Yun Ma*,
718 F. App'x 20 (2d Cir. 2017) .......................................................................................15

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020) ...........................................................23, 24

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ..................................................................13

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011)..........................................................................24, 26

*City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*,
2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011)....................................................................17

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
928 F. Supp. 2d 705 (S.D.N.Y. 2013)...............................................................................29

*Cruz v. TD Bank, N.A.*,
742 F.3d 520 (2d Cir. 2013)..............................................................................................30

4836-1856-3777.v1

**Page**

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)..................................................................................19, 20, 27

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ...........................................................................................25

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)..........................................................................13, 15

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund*
    *v. Royal Bank of Scotland Grp., PLC*,
    783 F.3d 383 (2d Cir. 2015)..............................................................................................17

*In re AT&T Corp. Sec. Litig.*,
    2002 WL 31190863 (D.N.J. Jan. 30, 2002) ......................................................................14

*In re Avon Sec. Litig.*,
    2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).......................................................... *passim*

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017)..................................................................................16

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2018 WL 2382600 (S.D.N.Y. May 24, 2018) ....................................................................16

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)................................................................................20

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)................................................................................15

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)................................................................................16

*In re Henry Schein, Inc. Sec. Litig.*,
    2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ..................................................................16

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...............................................................21, 22

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
    236 F. Supp. 3d 824 (S.D.N.Y. 2017)................................................................................27

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017)................................................................................16

4836-1856-3777.v1

**Page**

*In re MF Global Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................13

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................................26

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .......................................................20

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) ................................................................................19

*In re OSI Pharm., Inc. Sec. Litig.*,
    2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007)........................................................23

*In re Oxford Health Plans, I*nc.,
    187 F.R.D. 133 (S.D.N.Y. 1999) ..........................................................................26

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)....................................................................16

*In re Regeneron Pharm., Inc. Sec. Litig.*,
    2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)............................................................12

*In re Revlon, Inc. Sec. Litig.*,
    2001 WL 293820 (S.D.N.Y. Mar. 27, 2001) .........................................................18

*In re Salix Pharm., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).......................................2, 12, 18, 19

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)..............................................................................20, 27

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)........................................................17

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
    124 F. Supp. 2d 527 (S.D. Ohio 2000) ..................................................................26

*In re Vivendi, S.A. Sec. Litig,*
    838 F.3d 223 (2d Cir. 2016)..............................................................8, 9, 10, 15

*In re WEBMD Health Corp. Sec. Litig.*,
    2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ..............................................................14

4836-1856-3777.v1

**Page**

*In re Williams Sec. Litig.*,
339 F. Supp. 2d 1242 (N.D. Okla. 2003) ...................................................................14

*In re XM Satellite Radio Holdings Sec. Litig.*,
479 F. Supp. 2d 165 (D.D.C. 2007) ..........................................................................14

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ........................................................................................25

*Levy v. Gutierrez*,
2017 WL 2191592 (D.N.H. May 4, 2017) ..................................................................25

*Lopez v. Ctpartners Exec. Search Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016) ..........................................................................14

*Makor Issues & Rights. Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) .....................................................................................25

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ...................................................................................................7, 8

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016) ........................................................................28

*Meyer v. Jinksolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014) ......................................................................................10

*Micholle v. Ophthotech Corp.*,
2019 WL 4464802 (S.D.N.Y. Sept. 17, 2019) ................................................... *passim*

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ............................................................................13, 19

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019) ................................................................ *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ....................................................................................................7

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ..........................................................3, 19

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
2020 WL 2559939 (N.D. Cal. May 20, 2020) ............................................................17

4836-1856-3777.v1

**Page**

*Ressler v. Liz Claiborne, Inc.*,
    75 F. Supp. 2d 43 (E.D.N.Y. 1998) ................................................................18

*Roberti v. OSI Sys., Inc.*,
    2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)......................................................27

*SEC v. Gabelli*,
    653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*,
    568 U.S. 442 (2013)................................................................................7

*SEC v. Mayhew*,
    121 F.3d 44 (2d Cir. 1997)........................................................................15

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) ...................................................7, 25

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)......................................................................13

*Sonterra Capital Master Fund Ltd. v. UBS AG*,
    954 F.3d 529 (2d Cir. 2020).......................................................................6

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)........................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................19, 27

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013)...............................................................22

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)......................................................................................2, 6, 8, 28
    §78t(a) .......................................................................................7, 25, 28
    §78u-5(c)(1)(A)(i).................................................................................14

Federal Rules of Civil Procedure
    Rule 9(b) ........................................................................................7

17 C.F.R.
    §240.10b-5(b)...................................................................................6, 7

4836-1856-3777.v1

Lead Plaintiff National Elevator Industry Pension Fund ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants'[1] and the Bain Defendants' Motion to Dismiss the Amended Class Action Complaint (ECF Nos. 60-61) ("Motion" or "MTD").

## I.        INTRODUCTION

The key question in this case is whether a company misleads investors by offering assurances about its growth strategy while, behind the scenes, executing the opposite strategy. During August 9, 2018 through May 2, 2019, inclusive (the "Class Period"), Defendants repeatedly assured investors that the cause of Canada Goose's past success and its strategy moving forward was to grow demand "ahead of" inventory. *See* ¶¶9, 45-47, 66, 72, 74, 83, 95.[2] This strategy purportedly allowed Canada Goose to maintain its status as an exclusive luxury brand whose winter parkas sold at over $1,000 USD. *See* ¶2. Too much inventory, without proportionate demand, would result in lower sales and margins.

Thus, when analysts saw a rapid build-up in the Company's inventory during the Class Period, they asked Defendants to confirm that the elevated inventory levels signaled an accompanying increase in demand. *See* ¶¶44, 83. Defendants reassured investors that they were seeing "growing customer demand[s]" and therefore the quickly-accumulating inventory was not only in line with the Company's past strategy of building "demand ahead of supply," but was

---

[1]        "Defendants" are Canada Goose Holdings Inc. ("Canada Goose" or the "Company"), Chief Executive Officer ("CEO") Dani Reiss ("Reiss") and Chief Financial Officer ("CFO") Jonathan Sinclair ("Sinclair"). Defendants Reiss and Sinclair are collectively referred to as the "Individual Defendants." The "Bain Defendants" are: (1) Bain Capital, LP; (2) Brent (BC) Participation S.à r.l; (3) Brent (BC) S.à r.l; (4) Bain Capital Integral Investors 2008, L.P.; and (5) Bain Capital Investors, LLC.

[2]        All "¶" or "¶¶" references are to the Consolidated Amended Complaint for Violations of the Federal Securities Laws (ECF No. 43) ("CAC"), and emphasis is added and citations are omitted throughout, unless otherwise indicated.

- 1 -

"consistent with the sorts of levels of revenue growth" that Canada Goose expected going forward. ¶¶45-46, 51, 83.

However, unbeknownst to investors, Canada Goose had been engaged in a strategy that was the complete opposite of what Defendants represented publicly.  The Company was building inventory *before* demand had materialized for upcoming quarters.  Defendants do not dispute this change in strategy.  Indeed, when the truth came to light, defendant Reiss admitted that the Company had by then shifted its approach to "building inventory ahead of demand," which "reflect[ed] the change in our model of building demand ahead of supply."  ¶53.  Nor did Defendants adequately disclose the full extent and negative impact of timing shifts in the Company's direct-to-consumer ("DTC") sales channel.  In fact, defendant Reiss actually declined to answer pointed questions from analysts at the beginning of the Class Period on whether investors should expect a negative impact in the back half of the year from any timing shifts in the DTC channel.  *See* ¶63.  When the effects of the undisclosed timing shifts in the DTC channel and Canada Goose's new, supply-ahead-of-demand strategy became apparent – resulting in declining gross margins and a vastly reduced fiscal year ("FY") 2020 guidance – Canada Goose stock plummeted 30%.  *See* ¶¶53-54.

Defendants concede that the CAC sufficiently pleads reliance, economic loss and loss causation as required by §10(b), and only challenge whether the CAC adequately alleges that Defendants' statements were materially misleading and made with scienter.  Defendants' arguments for dismissal fail.  This case is not, as Defendants claim, about whether Defendants are liable for failing to accurately predict future performance, but about the fraudulent nature of Defendants' statements concerning *current* inventory strategies and metrics based on *presently-known* information about demand.  *See In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *10 (S.D.N.Y. Apr. 22, 2016) ("representations concerning current inventory levels constitute actionable

- 2 -

misstatements"). Because Defendants "'affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed,'" their misrepresentations are actionable. *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at \*7 (S.D.N.Y. Apr. 14, 2020). Given Defendants' statements about specific and contemporaneous metrics, the defenses of corporate puffery and safe harbor protection also fail.

With respect to scienter, the CAC does not rely on "generalized allegations," as Defendants claim (MTD at 24), but rather on their own statements, which confirm that Defendants worked with a robust "insights team" to continually monitor sales data and customer interactions and had "great" "visibility into expected future revenues," with knowledge of "the wholesale order book for all seasons." ¶¶126-128. That defendant Reiss and the Bain Defendants sold off more than $570 million USD in Company stock just before the close of the Company's disappointing third quarter 2019 ("3Q19") further bolsters the allegations that Defendants had extensive visibility into the material effects of inventory buildup and DTC timing shifts. *See* ¶¶123-125.

Because Defendants artificially inflated Canada Goose's stock price by knowingly or recklessly misrepresenting and omitting material facts about the state of the Company's inventory and strategy, and DTC timing shifts, the Court should deny Defendants' Motion in its entirety.

## II.    FACTUAL SUMMARY

Canada Goose is a Toronto-based outerwear manufacturer that, in the early 2000s, began to transition from a niche company supplying Arctic outdoor enthusiasts to a global luxury brand. *See* ¶¶2, 35. This transition was overseen by defendant Reiss, who became CEO in 2001. *See* ¶¶2, 23. In 2013, defendant Reiss sold approximately 70% of Canada Goose to a private equity giant, defendant Bain Capital, LP, which took the Company public in 2017. *See* ¶3. The Company reports its results in two segments, which are aligned with its sales channels: wholesale, through which the

- 3 -

4836-1856-3777.v1

Company sells its products to retail partners and distributors, and DTC, which is comprised of Canada Goose's e-commerce sites and brick-and-mortar retail stores.  *See* ¶38.  Because Canada Goose primarily manufactures and sells heavy-duty winter parkas and jackets, it experiences seasonal fluctuations in its revenue and operating results.  As a result, the Company's third and fourth fiscal quarters are critical to its overall financial performance.  For example, for FY 2018, *86.7%* of the Company's total revenues were generated in the last two fiscal quarters of the year. *See* ¶¶11, 39, 126.

Leading up to and during the Class Period, Canada Goose marketed itself to investors as a company that carefully managed its inventory to ensure it could maintain its luxury status and prices. *See* ¶¶2, 41-43.  This strategy allowed revenue growth to significantly outpace inventory growth.  In the two fiscal years after becoming a public company, Canada Goose posted annual growth rates of roughly 40%, earning it the designation of a "hyper growth" company, with analysts raising earnings expectations nearly every quarter following the Company's initial public offering.  *See* ¶41; *see also* ¶¶4, 42.  Analysts focused on Canada Goose's ability to continue managing inventory levels relative to demand as a key indicator of success.  *See* ¶¶4, 41-42.

Defendants led analysts to believe they could and would continue executing the strategy of growing demand ahead of supply.  The Individual Defendants touted the Company's ability to continuously monitor data about customer demand well in advance of particular selling seasons, with teams and metrics to guide decision-making.  *See* ¶¶126-128.  Purportedly informed by these metrics, Defendants repeatedly told investors that the Company was building demand for Canada Goose's products "ahead of supply," and that there were no underlying shifts in demand, including in Canada Goose's high-margin DTC sales channel.  *See* ¶¶9, 45-47, 66, 72, 74, 83, 95.

4836-1856-3777.v1

When Canada Goose reported inventory growth, investors believed it boded well for the Company's continued growth going forward, given Defendants' stated historic practice of building demand ahead of inventory. *See* ¶¶8, 44. For example, in the quarter before the start of the Class Period, Canada Goose accelerated its inventory production, which analysts viewed as one of the drivers of the Company's 144% year-over-year increase in revenue that quarter. *See id.* Defendant Sinclair confirmed analysts' and investors' belief that increased inventory supported increased demand, stating that the inventory buildup was "consistent with the sorts of levels of revenue growth and network growth that we're talking about." ¶¶46, 83. In reality, Defendants were building up inventories ahead of demand, causing Canada Goose's inventory levels to grow at a faster rate year-over-year than its revenues. At the same time, customers in the Company's DTC channel were purchasing higher-margin, heavy weight parkas earlier, at the expense of Canada Goose's critical third and fourth quarters. *See* ¶48. However, Defendants led investors to believe that increasing inventory was a signal of even faster-growing demand. Meanwhile, before the truth was disclosed – and while the Company's shares were trading near an all-time high – defendant Reiss and the Bain Defendants took advantage of the artificial inflation in the price of Canada Goose stock by selling a total of 10 million shares of Company stock. *See* ¶¶123-125. Defendant Reiss received nearly $97 million USD as a result of his sales – more than 100 times his FY 2019 salary. *See* ¶124.

The truth eventually came to light in a series of partial disclosures. On February 14, 2019, Canada Goose revealed that, in 3Q19, it had experienced gross margin declines in both the wholesale and DTC channels, as well as inventory growth that exceeded revenue growth. *See* ¶¶49-51. Canada Goose stock fell by roughly 13% on this news, but would have fallen further had the full truth been revealed. *See* ¶52. Instead, Defendants provided an explanation for the rising inventory levels that differed from the one they gave investors the prior quarter, reassuring investors that the

4836-1856-3777.v1

Company was building up inventory "in anticipation of growing customer demand in the fourth quarter of fiscal 2019," and reinforcing the false impression that Canada Goose's inflated inventories supported increased demand and accelerated growth. ¶¶15, 51, 93, 107.

On May 29, 2019, Canada Goose announced its fourth quarter of 2019 ("4Q19") and FY 2019 results that fell short of analysts' revenue expectations for the first time since becoming a publicly traded company. *See* ¶53. The Company also forecasted growth as low as 20% for FY 2020 – roughly half of what the Company had achieved in the three prior fiscal years. *See id*. Defendant Reiss acknowledged that the Company had changed from its previously stated strategy of building demand ahead of supply to one of "building inventory ahead of demand." *Id*. On this news, Canada Goose stock fell roughly 30%, with analysts noting "investor red flags," including "inventory levels [that] appeared heavy exiting the quarter" and "top-line growth slow down" in the "higher margin DTC business." ¶54.

## III.    ARGUMENT

### A.    Legal Standard

"In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor." *Micholle v. Ophthotech Corp.*, 2019 WL 4464802, at *5 (S.D.N.Y. Sept. 17, 2019); *see also Sonterra Capital Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 534-35 (2d Cir. 2020) ("[A]t the motion to dismiss stage, Plaintiffs need not prove the allegations in their complaint 'definitively.'"). Under §10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4)

4836-1856-3777.v1

reliance; (5) economic loss; and (6) loss causation.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  Defendants only contest the first two elements.[3]

**B.      The CAC Adequately Pleads Actionable Misstatements and Omissions**

Under Rule 10b-5, it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. §240.10b-5(b).  To adequately plead a false statement under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff must: "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Ophthotech*, 2019 WL 4464802, at *5.

"The 'veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers'" and "[s]tatements that are literally true may become misleading based upon 'their context and manner of presentation.'"  *Id*. at *6; *see also Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) ("even if literally true, Defendants' statements may have been misleading by what they failed to mention").  Indeed, "the law is well settled . . . that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud."  *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: ***An issuer must as well desist from misleading investors by saying one thing and holding back another***.");  *Skiadas v. Acer Therapeutics Inc.*, 2020 WL

---

[3]       The Bain Defendants only contest their liability under §20(a).

4836-1856-3777.v1

3268495, at *9 (S.D.N.Y. June 16, 2020) ("At the motion to dismiss stage of a securities fraud action, 'the court reads ambiguities' in challenged statements 'in [the plaintiff's] favor.' That is simply an application of the maxim that a court must draw all reasonable inferences in the plaintiff's favor on a motion to dismiss.") (alteration in original).

A fact is material under §10(b) "when there is a "'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available."'" *Matrixx*, 563 U.S. at 38. A "'complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Ophthotech*, 2019 WL 4464802, at *13. Furthermore, "[i]t is well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic." *In re Vivendi, S.A. Sec. Litig*, 838 F.3d 223, 258 (2d Cir. 2016).

Here, Defendants made material misrepresentations and omissions about two core aspects of Canada Goose's business: (1) the Company's inventory levels and how that correlated to future consumer demand and revenue growth; and (2) the timing of customers purchasing high-margin parkas through the Company's critical DTC channel. With respect to Canada Goose's rising inventory levels, the CAC sufficiently alleges that Defendants repeatedly, yet misleadingly, conveyed to investors that the Company was building customer demand ahead of supply. For example, Defendants reiterated that Canada Goose was "making sure that inventory is there to meet demand," that the Company was continuing to "create demand ahead of supply" and that it had "ample inventory to meet the demand both in wholesale and DTC." ¶¶66, 95, 100.

- 8 -

Defendants also gave shifting explanations for Canada Goose's elevated inventory levels. *See* ¶¶15, 52, 126. During the second quarter of 2019 ("2Q19") earnings conference call, for example, defendant Sinclair attributed the inventory buildup to the fact that Canada Goose had expanded its retail footprint to a total of 11 Company stores that quarter (compared with five the prior year) and 12 websites (compared with 11 in the prior year). *See* ¶83. The very next quarter, however, when asked about the significant increase in inventory, defendant Sinclair instead claimed that it was inventory being "built in advance of [Canada Goose's] fiscal year 2020." ¶98. Analysts concerned that this outsized inventory growth was a "red flag" were reassured by the Individual Defendants that the Company's "very healthy level of inventory" was created to meet already existing demand. *See* ¶¶10, 46, 54, 83, 85, 105, 117. But the truth, as Defendants would later reveal, was that Canada Goose was actually building inventories ahead of demand – a significant departure from what Defendants consistently told investors during the Class Period. *See* ¶¶16, 53, 70(a), 87(a), 108(a), 111.

Defendants' statements also created the misleading impression that Canada Goose's massive spikes in inventory were justified by increasing demand and accelerated growth consistent with historical trends. *See* ¶¶10, 15, 45, 52, 70(b), 87(b), 108(c). In the quarter before the start of the Class Period (the fourth quarter of 2018 ("4Q18")), for example, Canada Goose accelerated its inventory growth, delivering an impressive 144% year-over-year increase in total revenue and a staggering 160% year-over-year increase in the Company's DTC business. *See* ¶¶8, 41. Analysts and investors viewed Canada Goose's inventory growth as one of the catalysts driving the Company's outstanding 4Q18 results and believed it boded well for its continued growth going forward. *Id*. Thus, far from conjuring up allegations, as Defendants incorrectly claim (MTD at 13), the CAC demonstrates that Defendants, motivated to maintain Canada Goose's reputation as a

- 9 -

4836-1856-3777.v1

"hyper growth company," perpetuated the misperception that the Company's rapidly rising inventory levels meant Canada Goose would achieve continued, impressive revenue growth as it had in previous quarters.  *See* ¶44; *see also* ¶¶41-43, 106; *Meyer v. Jinksolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("'The literal truth of an isolated statement is insufficient; *the proper inquiry requires an examination of defendants' representations, taken together and in context*.'").

Defendants also concealed consumer purchasing timing shifts in the critical DTC channel, rendering their statements about the Company's DTC channel (*see, e.g.*, ¶¶57, 59, 61, 63-64, 72-73, 75-76, 78) false when made.  Although the Company *did* disclose that "seasonal fluctuations in *wholesale* and distributor customer demand" had "shifted the delivery timing of customer orders" in the *wholesale* channel, Defendants failed to disclose that the DTC channel was *also* experiencing a timing shift that had the potential to, and ultimately did, negatively impact Canada Goose's third and fourth fiscal quarters – the most important quarters for its DTC segment.  By discussing timing shifts in the wholesale channel, Defendants were obligated, but failed to disclose similar timing shifts in the DTC channel.  *See Vivendi*, 838 F.3d at 257 ("'once a company speaks on an issue or topic, there is a duty to tell the whole truth'"); *see also In re Avon Sec. Litig.*, 2019 WL 6115349, at \*14 (S.D.N.Y. Nov. 18, 2019) ("[W]hen an issuer or its officers 'make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate.'").

Defendants do not dispute the materiality of the DTC-related misstatements and omissions, and concede they are not forward-looking, and therefore not subject to the PSLRA's safe harbor. Instead, Defendants contend they fully informed investors about DTC timing shifts.  Contrary to Defendants' argument, however, defendant Reiss's vague statement that "'people are buying their parkas early'" (MTD at 21) did *not* disclose the full extent of DTC timing shifts.  Indeed, when questioned directly by analysts on whether investors should expect any impact to the back half of the

- 10 -

year in the Company's DTC channel due to timing shifts (as was the case with the wholesale channel), Reiss obfuscated the truth and refused to answer the question. *See* ¶63. It was not until Canada Goose reported its 3Q19 results, disclosing gross margin declines in the DTC channel and "**significantly more purchasing occurring earlier**," that investors were made aware that DTC timing shifts were negatively impacting the Company's financial results. *See* ¶¶13, 49, 96.[4] And even then, Defendants failed to disclose the full, negative impact of DTC timing shifts, instead reporting that Canada Goose was anticipating "growing customer demand in the fourth quarter of fiscal 2019," reiterating revised FY 2019 guidance and telling investors that the Company had "ample inventory to meet the demand both in wholesale *and DTC*." ¶¶93, 96, 100, 107, 129. The very next quarter (4Q19), however, Canada Goose reported DTC revenue that was below analysts' estimates. *See* ¶109.

Ignoring the CAC's well-pled allegations, Defendants also argue that Plaintiff fails to plead facts showing that they knew the timing shift would negatively impact the Company's last two fiscal quarters. *See* MTD at 22. As alleged in the CAC: (i) the DTC segment was critically important to Canada Goose's stated growth strategy and financial results because the Company generates higher margins on the products it sells directly through its DTC channel (*see* ¶11); (ii) DTC revenue from the third and fourth fiscal quarters comprises a significant amount (nearly 40% in FY 2018) of Canada Goose's *total* annual revenue (*see* ¶¶11, 39); (iii) the Company had just 11 retail stores and

---

[4]    Defendants wrongly claim that the CAC fails to allege any negative impact to the 3Q19 from DTC timing shifts. *See* MTD at 3. As the CAC alleges, in 3Q19, Canada Goose reported a **decrease** in DTC gross margins, which missed analysts' estimates. *See* ¶¶13, 94, 96, 105. The Company specifically attributed the gross margin declines to "a shift in product mix, with a higher proportion of lightweight down jacket sales," *i.e.*, customers buying less of the Company's more expensive, higher-margin, heavy parkas during the peak winter and holiday season. *See* ¶¶13, 94, 96. Following the Company's revelations, analysts commented that "investors were surprised" by the gross margins miss. *See* ¶106.

12 e-commerce sites in operation during the Class Period (*see* ¶127); and (iv) Defendants collected detailed data about the Company and its customers, which they used in tactical and strategic decision making (*see id.*).  In light of these and the CAC's other detailed allegations, it strains credulity to suggest, as Defendants do, that they "did not know" that DTC timing shifts threatened the Company's critical third and fourth fiscal quarter performance.

### C.    Defendants' Statements Are Not Protected by the PSLRA Safe Harbor

Defendants incorrectly contend that many of the challenged inventory-related statements are forward-looking statements protected by the PSLRA safe harbor and the "bespeaks caution" doctrine.  MTD at 18-20.

First, the CAC alleges numerous, actionable, ***non-forward*** looking misstatements and omissions regarding Canada Goose's inventories and demand.  Specifically, Defendants repeatedly told investors that the Company was building demand "ahead of supply," when in reality, Defendants were actually building inventories ahead of, and in the hopes of, substantial consumer demand.  Thus, statements that Canada Goose was "making sure that inventory is there to meet demand" (¶66), continuing to "create demand ahead of supply" (¶95) and had "ample inventory to meet the demand both in wholesale and DTC" (¶100) are clearly representations of then-present facts.  *See also Salix*, 2016 WL 1629341, at *10 ("Those representations concerning current inventory levels constitute actionable misstatements, and, because they pertain to present facts rather than future projections, are not subject to the heightened scienter requirement of the PSLRA safe harbor.").  Defendants' material misrepresentations about Canada Goose's then-present inventory buildup and practices also gave investors the misleading impression that the Company would continue to experience increasing demand and accelerated revenue growth in line with historical trends.  *See* ¶¶10, 15, 45, 52, 70(b), 87(b), 108(c); *see also In re Regeneron Pharm., Inc. Sec. Litig.*,

- 12 -

2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005) ("Statements that might arguably have some forward-looking aspect are unprotected by the PSLRA safe harbor provision *to the extent that they are premised on representations of present fact*."); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) ("[T]he safe harbor does not apply to material omissions.").

Second, Defendants' argument that they are immunized from liability by the Company's supposedly adequate cautionary language (*see* MTD at 18-20) is unavailing. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) ("cautionary language" must be "'tailored to the specific future projection'"); *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) ("Vague disclosures of general risks will not protect defendants from liability. Instead, the relevant cautionary language must be 'prominent and specific,' and must directly address 'exactly the risk that plaintiffs claim was not disclosed.'"). Here, the CAC does not allege that Defendants incorrectly forecasted their inventory needs or demand for their products – the risks warned of in cautionary statements (*see* MTD at 19) – but rather that Defendants misled investors that Canada Goose was creating customer demand ahead of supply. *See* ¶¶70, 87. In truth, the Company was ramping up its inventory in the hopes that demand would follow. *See id.*; *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) ("[W]hen asked directly about the company's inventory levels, defendants responded either that Celestica was managing its inventory well or that any inventory problems were aberrations. In sum, defendants 'did more than just offer rosy predictions'. . . . Thus, defendants[] cannot obtain dismissal under the PSLRA safe harbor."). Because Defendants' cautionary language failed to warn of the risks at the heart of the misrepresentations in this case, their safe harbor defense fails. *See, e.g.*, *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017) (no safe harbor

- 13 -

protection where "[t]he risk factors plainly did not warn investors about the relevant risk that led to the restatement: misconduct").[5]

Finally, "[n]either the safe harbor doctrine, nor the bespeaks caution doctrine, was designed to protect the dissemination of intentionally misleading information by simply adding the necessary cautionary language to a misrepresentation." *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1257 (N.D. Okla. 2003); *see also In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *14 (D.N.J. Jan. 30, 2002) ("the safe harbor provision does not afford corporations a free pass to lie to investors"). Defendants' safe harbor defense fails for the additional reason that the CAC adequately alleges that the challenged statements were made with knowledge of their falsity. *See* §III.E., *infra*; 15 U.S.C. §78u-5(c)(1)(A)(i) (forward-looking statements protected by the safe harbor *only* if they: (i) are accompanied by appropriate cautionary language sufficiently "meaningful" to render the false forward-looking statements immaterial; or (ii) were not made with actual knowledge of their falsity).

**D.      Defendants' Material Misstatements Are Neither Inactionable Corporate Puffery nor Opinions**

Assessing the materiality of a statement entails "a fact-specific inquiry as to whether 'there is a substantial likelihood that a reasonable shareholder would consider [the stated or omitted fact]

---

[5]      Unlike here, the cases relied upon by Defendants (*see* MTD at 19-20) all involve cautionary language that warned of the *specific risk* that later materialized. *See, e.g.*, *In re WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511, at *3, *8 (S.D.N.Y. Jan. 2, 2013) (defendants allegedly hid that the company was "'taking an increasingly cautious approach to advertising,' due to uncertainty regarding the FDA's position on pharmaceutical advertising," but the company had warned that "'regulatory changes affecting advertising and promotion of drugs' . . . could affect revenue"); *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 169, 185 (D.D.C. 2007) (defendants predicted "'even stronger outlook for the second half of the year,'" but cautioned that forecasts might differ from actual results "'[d]ue to . . . future demand for the Company's service'"); *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 39 (S.D.N.Y. 2016) (defendants touted corporate culture and a fair, transparent compensation scheme in predicting earnings, but defendants cautioned that earnings could vary based on the "'ability to forecast, on a quarterly basis, variable compensation accruals that ultimately are determined based on the achievement of annual results'").

4836-1856-3777.v1

important in deciding how to act.'" *Ophthotech*, 2019 WL 4464802, at \*13 (alteration in original). Here, Defendants discussed Canada Goose's inventory levels in every Class Period Securities and Exchange Commission filing and earnings call. *See* ¶¶45-46, 51, 53, 60, 65-66, 77, 83-84, 87, 90, 93, 98-101, 107. Analysts repeatedly questioned Defendants about the Company's inventory levels and discussed that metric in published reports disseminated to investors (*see* ¶¶45, 50, 54, 65-66, 83-85, 97, 101-102, 105-106, 111-112). Accordingly, Canada Goose's inventory levels and strategy were obviously material to investors. *See SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) ("[A] major factor in determining whether information was material is the importance attached to it by those who knew about it."); *comScore*, 268 F. Supp. 3d at 550 (information material to investors where analysts and the company's CFO highlighted it as an important metric); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 520 (S.D.N.Y. 2013) ("reactions of securities analysts supported an inference of materiality at the motion to dismiss stage").

The materiality of Defendants' misrepresentations and omissions is also established by the significant stock price declines (nearly 13% and 31%) that followed the partial disclosures on February 14, 2019 and May 29, 2019, respectively, related to gross margin declines and unanticipated spikes in Canada Goose's inventory levels for 3Q19 and 4Q19. *See* ¶¶133-135; *see also Christine Asia Co. Ltd. v. Yun Ma*, 718 F. App'x 20, 22 (2d Cir. 2017) ("The importance of this information to investors is illustrated by the fact that, when it was revealed four months subsequent to the IPO, Alibaba's stock dropped 13% in two days . . . ."); *comScore*, 268 F. Supp. 3d at 550 ("comScore's significant stock drop further supports an inference of materiality").

Defendants' puffery argument also fails. "Puffery encompasses 'statements [that] are too general to cause a reasonable investor to rely upon them,' and thus 'cannot have misled a reasonable investor.'" *Vivendi*, 838 F.3d at 245. "However, more definite statements about a company's

4836-1856-3777.v1

business practices may invoke reasonable reliance by investors, ***particularly if the statements relate to aspects of a company's brand or reputation that are touted as sources of its success*.**  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 611 (S.D.N.Y. 2017).  As such, a defendant's statement cannot be analyzed in a vacuum, but must be viewed in "the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *see also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 384 (S.D.N.Y. 2012) ("[T]he mere fact that a statement uses conclusory, indefinite, and unverifiable terms, rather than expressing a reason in dollars and cents, does not compel a conclusion that it is immaterial as a matter of law.").  Therefore, "[w]hile certain statements, 'viewed in isolation, may be mere puffery,' when the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may become material to investors." *In re BHP Billiton Ltd. Sec. Litig*., 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017); *see also Avon*, 2019 WL 6115349, at *16 (same).

Here, Defendants' statements that Canada Goose was continuing to "create demand ahead of supply" (¶95), was "making sure that inventory is there to meet demand" (¶66) and "[had] ample inventory to meet demand both in the wholesale and DTC" (¶100) are material misrepresentations of existing facts.  *See In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) ("'[T]here is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentations of existing facts.'"). Defendants repeatedly made those statements to analysts and investors, often in response to questions posed on quarterly conference calls, about one of the Company's important financial metrics, *i.e.*, its inventory levels and practices.  Such repeated representations are not puffery and are actionable.  *See BHP*, 276 F. Supp. 3d at 79 (citing cases); *In re Henry Schein, Inc. Sec. Litig*., 2019

- 16 -

WL 8638851, at *12 (E.D.N.Y. Sept. 27, 2019); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL

6167889, at *12 (S.D.N.Y. Nov. 26, 2018).[6]

Nor are Defendants' material misrepresentations about "building demand ahead of supply"

inactionable opinions. As explained above, Defendants' statements that Canada Goose was building

demand ahead of supply were misrepresentations of ***existing facts*** and therefore are not expressions

of "opinion or belief." *Avon*, 2019 WL 6115349, at *13; *see also Lexmark*, 367 F. Supp. 3d at 32

("Defendants' blanket characterization of the statements as mere opinions strains credulity. . . .

Some of the alleged misstatements purport to state historical facts."); *Police Ret. Sys. of St. Louis v.*

*Granite Constr. Inc.*, 2020 WL 2559939, at *5 (N.D. Cal. May 20, 2020) ("***The Supreme Court has***

***explicitly placed statements about existing things in the realm of 'fact,' rather than 'opinion' . . . .***

***[T]he complaint deals with then-existing facts and does not need to address the relationship***

***between [defendant's] beliefs and whether those beliefs rate as objectively true***.").

Even if Defendants' inventory misrepresentations were opinions, they are nonetheless

actionable ones. A statement of opinion can be actionable if it omits facts necessary to make the

statement not misleading to a reasonable investor, so long as the plaintiff: "(1) identif[ies] the

omitted fact, (2) show[s] that 'the omitted fact would have been material to a reasonable investor,'

(3) establish[es] that the omission rendered the opinion misleading to a reasonable investor, and (4)

---

[6]     In support of their puffery argument, Defendants cite cases in which companies merely made rosy projections for the future without the kind of benchmarks or quantification present here. *See, e.g.*, *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015) (integration was "'off to a promising start,' '[our] positive view . . . has been confirmed,' [and] 'we are happy we bought what we thought we bought'"); *Ophthotech*, 2019 WL 4464802, at *11 n.12 (clinical trial was "'well conducted,' 'robust,' and . . . produced results of 'statistical and clinical significance'"); *City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*, 2011 WL 7158548, at *2 (S.D.N.Y. Sept. 6, 2011) (industry trend was "'good'" for company; company was "'best positioned'" to deal with trend and "'very optimistic'" about new products; "'things seem[] to be a little bit quieter'"; and company had a "'very good handle'" on the situation).

4836-1856-3777.v1

take[s] into account the 'statement's context,' including relevant 'hedges, disclaimers, or qualifications.'" *Ophthotech*, 2019 WL 4464802, at *7; *see also Salix*, 2016 WL 1629341, at *12 n.10 ("A statement of opinion may be actionable if it is predicated upon an untrue supporting statement of fact or if the statement omits material facts about the speaker's 'inquiry into or knowledge concerning a statement of opinion.'").[7]

First, the CAC alleges that Defendants' misrepresentations about "building demand ahead of supply" omitted that Canada Goose was actually doing the exact opposite at the time – building up its supply (*i.e.*, inventories) ahead, and in hopes of, increased consumer demand. *See* ¶53.  Second, as demonstrated above, Defendants' omissions were material to investors. *See Lexmark*, 367 F. Supp. 3d at 31 ("[T]he central allegations in the Complaint . . . amply suggest that investors would have wanted to know that Lexmark's EMEA channel inventory had swollen to unusual levels during the Class Period."); *see also In re Revlon, Inc. Sec. Litig.*, 2001 WL 293820, at *10 (S.D.N.Y. Mar. 27, 2001) ("[T]he Court cannot say that Revlon's customers' allegedly ballooning inventories . . . 'are so obviously unimportant to a reasonable investor that reasonable minds could not differ' on the issue of materiality."). Third, the fact that Canada Goose was building inventories ahead of demand – contrary to the impression Defendants gave analysts and investors during the Class Period – would certainly render Defendants' publicly stated "opinions" on then-existing inventory levels and

---

[7]      Defendants' reliance on *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 55 (E.D.N.Y. 1998), is inapposite. *See* MTD at 18.  Here, unlike in *Liz Claiborne*, Defendants admitted to contemporaneous knowledge.  For example, Defendants based their tactical and strategic decision-making during the Class Period on data from an in-house insights team, which was specifically dedicated to continuously monitoring data related to the Company's brand in all of its key markets, and which collected detailed data about Canada Goose's customers through customer interactions with the Company. *See* ¶¶126-127.  Indeed, Defendants admitted their awareness of these metrics, stating that "fall/winter and spring order books are set down to the color [and] style . . . well in advance," and Defendants therefore had "great . . . 'visibility into expected future revenues, with a majority of [wholesale] orders received before the end of the prior fiscal year.'"  ¶128.

4836-1856-3777.v1

practices misleading to a reasonable investor. *See Salix*, 2016 WL 1629341, at \*10 ("The omission of any information with respect to current inventory levels is material and misleading, because that omission led analysts to believe that inventory levels were merely slightly outside of the range that Defendants described as 'normal' and could be returned to that level within about three months."). Fourth, Defendants made no hedges, disclaimers or qualifications that would otherwise shield their purported statements of opinion from liability under the federal securities laws. *See Davis*, 2020 WL 1877821, at \*9 (upholding as material statements that contradicted the "well-defined strategy" defendants publicly misrepresented to investors); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 479 (6th Cir. 2014) ("In passing the 1934 Act, Congress did not intend to allow corporations or their officers to insulate themselves by simply attaching throat-clearing language to their public utterances.").

### E.      The CAC Sufficiently Alleges a Strong Inference of Scienter

A "strong inference" of scienter is pleaded when, accepting the allegations as true and considering them collectively, a reasonable person would deem the inference of scienter at least as compelling as an opposing inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.*; *cf. Lexmark*, 367 F. Supp. 3d at 38 ("None of Defendants' arguments are availing. Plaintiffs do not rely on any confidential witnesses, but **this Court is aware of no authority requiring confidential witness allegations**."). In the Second Circuit, scienter can be established by "showing either: 1) a 'motive and opportunity to commit fraud'; *or* 2) '[furnishing] circumstantial evidence of conscious misbehavior or recklessness.'" *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

- 19 -

"[R]ecklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001). A cogent and compelling inference of scienter can also be raised under the "core operations" theory. Under this theory, "'a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue.'" *Lexmark*, 367 F. Supp. 3d at 37 (citing cases). The core operations theory permits an inference of scienter "even without specific allegations that senior management had actual knowledge" of the information at issue. *Avon*, 2019 WL 6115349, at *20 (citing cases). Unusual stock sales – like those of defendant Reiss and the Bain Defendants – can also bolster the inference of a defendant's scienter. *See Blanford*, 794 F.3d at 308-09. As set forth below, when reviewed in context and in their totality, the CAC's allegations create an inference of scienter that is at least as compelling as any opposing inference offered by Defendants.

### 1. The Individual Defendants' Positions, Access to Data and Public Statements to Investors Support an Inference of Scienter

The Individual Defendants' high-ranking positions are relevant factors when weighing the CAC's allegations of scienter. *See, e.g.*, *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017) ("[CEO's] and [CFO's] positions within the Company and its subsidiaries further bolster the circumstantial evidence supporting an inference of scienter."); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018) (same). As Chairman and CEO (possessing around 33% of the combined voting shares), defendant Reiss's role at Canada Goose included developing "the Company's vision and strategy," establishing its "strategic and operational priorities" and providing "leadership support to the Company's officers for the effective overall

- 20 -

management of the business." ¶23.  Defendant Sinclair, Canada Goose's CFO, was considered Reiss's "business partner," having "full oversight over the Company's finance function, including accounting and controls, planning and analysis." ¶24.  During the Class Period conference calls, the Individual Defendants repeatedly spoke about Canada Goose's inventory levels and practices, consumer demand and buying patterns in the DTC and wholesale channels – the very topics about which the CAC alleges Defendants misled investors. *See* ¶¶45, 53, 62-64, 66, 83-84, 95-96, 98-102; *see also In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) ("Plaintiff has met this [scienter] burden.  First, the 10(b) Defendants include members of Hi-Crush's senior management team . . . .  These four individuals were intimately involved in the day-to-day operations of Hi-Crush, and they can be presumed to have knowledge of the company's core operations.").[8]

The inference of scienter with respect to Defendants' misrepresentations and omissions about DTC timing shifts is also bolstered by the fact that the DTC channel was of critical importance to the Company's financial success.  *See* ¶¶38, 40, 126-127; *see also Lexmark*, 367 F. Supp. 3d at 38 ("While not dispositive, the importance of EMEA channel inventory to Lexmark's business moves the needle in Plaintiffs' favor."); *cf. Avon*, 2019 WL 6115349, at *20 ("'Core operations' include matters 'critical to the long term viability' of the company and events affecting a 'significant source of income.'").  For example, the sale of a jacket through Canada Goose's DTC channel provides a two-to-four times greater contribution to segment operating income per jacket than the sale of the

---

[8]     Defendants do not dispute that scienter can be imputed to Canada Goose through its top two executives, *i.e.*, defendants Reiss (Chairman and CEO) and Sinclair (CFO).  *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 615 F. App'x 44, 45 (2d Cir. 2015) ("[G]iven Wang's position as China North's former CEO, his scienter can be imputed to the company.").  Because Defendants have not raised any such argument in their opening brief, they have waived the right to do so on reply.

4836-1856-3777.v1

same jacket in the Company's wholesale channel. *See* ¶40. Further, for FY 2018 (which ended March 31, 2018), Canada Goose's DTC channel accounted for more than *43%* of the Company's *total* revenue for that period, and during the Class Period, Defendants only sought to expand the DTC channel. *See* ¶¶38, 40; *see also Hi-Crush*, 2013 WL 6233561, at *26 ("agreement [that] was a 'significant source of income'" and "'critical to the long term viability' of Hi-Crush" was "unquestionably within its 'core operations'"); *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1123 (C.D. Cal. 2012) ("It strains credulity to believe that [the defendant's] directors and officers did not know that a factory that . . . generated 20% of total company sales was not functioning."). Canada Goose also had an in-house insights team specifically dedicated to continually monitoring a large swath of data related to the Company's brand in all of its key markets. ¶127. And the Company collected information about its DTC customers who purchased (or sought to purchase) products on the Company's website or through its various retail brick-and-mortar stores. *Id*.

### 2. The More than $570 Million USD in Insider Trading Supports an Inference of Scienter

As courts in this Circuit have recognized, a strong inference of scienter can be bolstered by allegations of motive and opportunity, and "motive '"is adequately-alleged where the plaintiffs allege that the defendants sold their own shares while at the same time misrepresenting corporate performance in order to inflate stock prices."'" *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 475 (S.D.N.Y. 2013); *see also Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (finding a strong inference of scienter where "[s]ome of the sales occurred after the representations were made" and further finding that "the statements that continued to be made after the sales that followed the earlier statements could well be probative of an intent to keep the stock price high in

order to avoid detection of the alleged fraud").  Here, defendant Reiss's and the Bain Defendants' stock sales give rise to an inference of scienter.

As alleged in the CAC, on November 29, 2018, approximately two weeks after Canada Goose announced its 2Q19 results and Defendants made material misrepresentations about the Company's inventory levels and practices and its DTC channel, defendant Reiss and the Bain Defendants, in connection with Canada Goose's Subordinate Voting Shares Offering (the "Offering"), sold nearly 10 million shares while the Company's stock was trading at close to an all-time high, for ***proceeds totaling more than $570 million USD***.  *See* ¶¶12, 23, 32, 123-125; *see also In re OSI Pharm., Inc. Sec. Litig.*, 2007 WL 9672541, at \*12 (E.D.N.Y. Mar. 31, 2007) (finding that stock sales by defendants in an offering supported inference of scienter).[9]  The sales by defendant Reiss and the Bain Defendants occurred three months before Canada Goose announced its next quarter's results, *i.e.*, 3Q19, and the first partial disclosure of Defendants' fraudulent conduct became public, sending the Company's stock price rocketing down nearly 13%.  *See* ¶¶124-125, 133.  The timing of these sales, and the enormous gross proceeds reaped by defendant Reiss and the Bain Defendants, give rise to a strong inference of scienter for both Canada Goose and defendant Reiss.[10]  *See, e.g.*, ¶43.

---

[9]    Only "selling shareholders" like defendant Reiss and the Bain Defendants profited from this Offering, as the Company "[did] not receive any of the proceeds from the sale of subordinate voting shares by the selling shareholders."  ECF No. 62-10 (Ex. J) at 7.

[10]    Thus, unlike in *Ophthotech*, where this Court found that defendants' stock sales did not contribute to an inference of scienter, in part because the plaintiff there did not allege "that the sales were suspiciously timed to occur soon after the allegedly misleading statements were made or shortly before any corrective disclosure or materialized risk," Plaintiff has provided such allegations. 2019 WL 4464802, at \*15; *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 2020 WL 1529371, at \*25 (S.D.N.Y. Mar. 30, 2020) ("'Indeed, courts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure.'"); *but see Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at \*15 (C.D. Cal. July 1, 2008) ("Even if [the CEO] sold a small percentage of his

- 23 -

Defendants' arguments for why these insider sales do not support scienter should be rejected. First, the fact that the more than $570 million USD in insider trading by defendant Reiss and the Bain Defendants occurred in connection with a "pre-planned secondary equity offering" (*see* MTD at 25), where only the selling shareholders profited, "is not dispositive of the question whether all the facts and circumstances are sufficient for purposes of alleging sufficient motive." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 421-22 (S.D.N.Y. 2011). The reason, as Judge Koeltl explained in *EnergySolutions*, is because "[w]hether there are sufficient allegations for scienter **turns on all of the facts and circumstances of the sales**." *Id*. at 422. In that case, Judge Koeltl found defendants' argument "that an interest in stock sold in an IPO or significant public offering could **never** qualify as motive for purposes of scienter" as "plainly incompatible with the holding by the Court of Appeals that 'motive [can be] sufficiently pleaded where plaintiff allege[s] that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares.'" *Id*. (alterations and emphasis in original).[11]

Second, that the Bain Defendants did not make or prepare the alleged material misrepresentations does not mean that their enormous insider sales cannot support an inference of scienter with respect to Canada Goose. As the CAC alleges, the Bain Defendants had two representatives sitting on Canada Goose's Board of Directors during the Class Period and owned nearly 60% of the combined voting power over the Company. ¶¶30-31. Furthermore, the Company

---

holdings, **this sale is suspect based on plaintiff's allegations that the sale occurred only a few months before Occam first projected flat revenues**.").

[11]    In *Evoqua*, a decision Defendants rely upon (*see* MTD at 25) – Judge Nathan agreed with Judge Koeltl on this point. *See Evoqua*, 2020 WL 1529371, at *25. Also, in *Evoqua*, unlike here, none of the defendants traded "in the **months** surrounding the [negative disclosures] that came . . . in 2018" and the individual defendants there also increased their holdings during the Class Period. *Id*. (emphasis in original).

4836-1856-3777.v1

admitted that the Bain Defendants had "the ability to exercise substantial control over all corporate actions requiring shareholder approval" (*see* ¶31) and "will continue to be able to strongly influence or effectively control [Canada Goose's] decisions." ¶157. Thus as control persons liable under §20(a) (*see* §III.F., *infra*), the Bain Defendants' significant insider trading can be considered as circumstantial evidence of Canada Goose's scienter.

Third, that defendant Sinclair did not sell any shares in the Offering does not undermine the CAC's allegations of scienter (*see* MTD at 26 n.14), since his Canada Goose shares did not begin to vest until calendar year 2019. *See* ¶24 n.4.

Fourth, in arguing that defendant Reiss and the Bain Defendants lost money following Defendants' revelations, which Defendants contend nullifies any allegation of scienter (MTD at 26), Defendants "'confuse[] expected with realized benefits.'" *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016); *see, e.g.*, *Acer Therapeutics*, 2020 WL 3268495, at *12 ("'The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered; though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.'") (quoting *Makor Issues & Rights. Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001) ("The ultimate profitability of a course of conduct is not conclusive of intent."). Indeed, that Reiss and the Bain Defendants lost money when the truth about the fraud was revealed has no bearing on the issue of their scienter at the time the material misrepresentations were made. Simply put, the "'securities laws prohibit foolish frauds along with clever ones.'" *Levy v. Gutierrez*, 2017 WL 2191592, at *13 (D.N.H. May 4, 2017) (quoting *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 728 (7th Cir. 2004)).

- 25 -

Fifth, contrary to Defendants' argument, there is no bright line rule as to the percentage of stock an insider must sell in order for the sales to strengthen an inference of scienter. *See* MTD at 26-27; *Ophthotech*, 2019 WL 4464802, at *14 ("'There is no *per se* rule . . . that sale of a particular monetary amount or percentage of total holdings is unusual.'"); *see also EnergySolutions*, 814 F. Supp. 2d at 422 ("Whether there are sufficient allegations for scienter ***turns on all of the facts and circumstances of the sales*** . . . .); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 646 (E.D. Va. 2000) ("[E]ven if the aggregated sales as a percentage of the Individual Defendants' total holdings superficially appear unimpressive, they take on greater weight when the timing of the sales is taken into consideration."). Numerous courts have found that insider sales similar in size to the percentage of stock sold by defendant Reiss (7%) and the Bain Defendants (19.5%) bolstered scienter. *See, e.g.*, *In re Oxford Health Plans, I*nc., 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (holding that stock sales representing as low as 11% of total holdings are "sufficient to create, along with the other allegations, a strong inference of scienter"); *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1262 (D. Nev. 2019) (determining that stock sales that "represented between .43% and 8.6% of holdings . . . but netted . . . $83,073,245.16 . . . support[ed] an inference of scienter"); *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000) (sale of 11% of total holdings represented a "significant portion[] of stock" and therefore supported scienter inference); *Occam*, 2008 WL 2676364, at *14-*15 (sales equaling approximately 7% of CEO's total holdings supported inference of scienter).

Finally, Defendants quibble with Plaintiff's use of "proceeds" versus "profits." MTD at 27. Defendants' efforts to raise the pleading bar by demanding evidence of the profits Reiss and the Bain

4836-1856-3777.v1

Defendants netted from their sale of Canada Goose stock should be rejected.[12] *See Blanford*, 794 F.3d at 306 ("While robust, this pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage.") (citing *Tellabs*, 551 U.S. at 324 n.5); *see also Scholastic*, 252 F.3d at 72 ("we do not require the pleading of detailed evidentiary matter in securities litigation"). At bottom, defendant Reiss's and the Bain Defendants' stock sales – which collectively totaled over $570 million USD – were ***unusual in amount*** – whether pled as proceeds or profits – and support an inference of scienter.

### 3. Defendants' Scienter Is Also Supported by the Close Proximity Between Their Material Misstatements in February 2019 and the Ultimate Corrective Disclosure in May 2019

The temporal proximity of Defendants' misrepresentations relative to the disclosure of the truth further supports an inference of scienter. Courts routinely hold that misrepresentations made within six months of disclosure are probative of scienter. *See, e.g.*, *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 834 n.6 (S.D.N.Y. 2017) (holding that close proximity of just over a month, between disclosure of allegedly concealed facts and statements concealing information supported inference of scienter); *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *11 (C.D. Cal. Feb. 27, 2015) (disclosure was "made less than six months after" misrepresentation, "and thus is supportive of scienter"); *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 483 (E.D. Va. 2002) ("The temporal proximity between financial viability on May 30 and financial expiration two or so months later supports an inference that can augment the other aspects of the scienter allegations

---

[12] Information regarding the "profits" defendant Reiss and the Bain Defendants received from their sales of Canada Goose stock is not publicly available. Thus, without the aid of discovery, it is impossible for Plaintiff to determine what defendant Reiss's cost basis was for the nearly $97 million worth of shares he sold in November 2018. The same is true with respect to the Bain Defendants.

here."). On February 14, 2019, Defendants told investors they were "creat[ing] demand ahead of supply" and anticipating "growing customer demand in the fourth quarter of fiscal 2019." ¶51. Just three-and-a-half months later, on May 29, 2019, Defendants reversed course, disclosing disappointing 4Q19 revenue and that the Company had instituted a "change in our model of building demand ahead of supply" to "building inventory ahead of demand." ¶53. The close timing of the February misrepresentations and ultimate disclosure of changed strategy thus bolsters the inference of scienter. ¶129.

### F.  The CAC Sufficiently Alleges Violations of §20(a)

The CAC establishes a prima facie case of control person liability as to both the Individual Defendants and the Bain Defendants by showing: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant[s], and (3) that the defendant[s] [were], in some meaningful sense, . . . culpable participant[s] in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007); *see also Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 587 (S.D.N.Y. 2016) ("'[D]etermining an individual defendant's liability as a control person is a "fact-intensive inquiry that . . . should not be resolved on a motion to dismiss."'").

As demonstrated above (*see* §§III.A.-E.), the CAC adequately alleges an underlying violation of §10(b). *See Menaldi*, 164 F. Supp. 3d at 587 ("Plaintiffs have . . . plausibly alleged a primary violation of §10(b) and Rule 10b-5(b) by Defendants [and] have thus pleaded the first element of control person liability as to those two Defendants."). The CAC likewise satisfies the second element, which Defendants do not dispute.

The CAC also satisfies the third prong, culpable participation. As a threshold matter, "[c]ourts in this District disagree about whether culpable participation must be pleaded with

particularity, or instead, is an affirmative defense in which the burden to establish the absence of culpable conduct shifts to the defense." *Id.* Here, Defendants make no attempt to establish the absence of culpable conduct on behalf of the Bain Defendants. Regardless, the CAC alleges the Bain Defendants' culpable participation with particularity. Defendants also incorrectly claim that the CAC "rel[ies] on boilerplate allegations that they had access to and otherwise participated in the allegedly false and misleading statements." MTD at 30 (citing ¶156). This argument ignores the CAC's specific and substantive allegations about the Bain Defendants' participation in the scheme by virtue of their share ownership, power to elect and remove directors from the Board of Directors, and ability to approve significant corporate transactions. And as Canada Goose admitted, "Bain Capital will *continue* to be able to strongly influence or effectively control our decisions." ¶¶31, 157. These allegations are more than sufficient to establish culpable participation by the Bain Defendants at the pleading stage. *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013) ("[W]here a plaintiff alleges that the directors and officers participated in the alleged primary conduct, that is sufficient to state a claim for control person liability.").

## IV.    CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court deny Defendants' Motion in its entirety. If the Court grants Defendants' Motion in whole or in part, Plaintiff

- 29 -

respectfully requests leave to amend, which is typically freely given.  *See Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead.").

DATED:  July 10, 2020

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
MATTHEW I. ALPERT
ALEXI H. PFEFFER-GILLETT

s/ MATTHEW I. ALPERT
MATTHEW I. ALPERT

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
malpert@rgrdlaw.com
agillett@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ERIN W. BOARDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
eboardman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
MAUREEN E. MUELLER
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
mmueller@rgrdlaw.com

- 30 -

Lead Counsel for Lead Plaintiff

O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE III
JOHN M. McINTIRE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
202/362-2640 (fax)
lmalone@odonoghuelaw.com
jmcintire@odonoghuelaw.com

Additional Counsel for Lead Plaintiff

4836-1856-3777.v1

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 10, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ MATTHEW I. ALPERT
MATTHEW I. ALPERT

ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

E-mail:  malpert@rgrdlaw.com

4836-1856-3777.v1

# Mailing Information for a Case 1:19-cv-08204-VSB Cheng v. Canada Goose Holdings Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew I. Alpert**
  MAlpert@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com,MAlpert@ecf.courtdrive.com

- **Erin Whitney Boardman**
  eboardman@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Spencer A. Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Martin Jonathan Crisp**
  martin.crisp@ropesgray.com,courtalert@ropesgray.com,Deanna.Minasi@ropesgray.com

- **William Scott Holleman**
  holleman@bespc.com,ecf@bespc.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Robert G. Jones**
  robert.jones@ropesgray.com,CourtAlert@RopesGray.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Maureen Elizabeth Mueller**
  mmueller@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Alexi Pfeffer-Gillett**
  agillett@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)