UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                   :

LI HONG CHENG and NATIONAL     :
ELEVATOR INDUSTRY PENSION FUND,  :
Individually and on Behalf of All Others  :
Similarly Situated,                   :
                                   :

                     Plaintiffs,   :

                                   :

         - against -          :

                                   :

CANADA GOOSE HOLDINGS INC., et al.,  :
                                 :

               Defendants.  :

                                 :
-------------------------------------------------------- X

19-CV-8204 (VSB)

**<u>OPINION & ORDER</u>**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/19/2021

<u>Appearances</u>:

Matthew I. Alpert
Robbins Geller Rudman & Dowd LLP
Melville, NY
*Counsel for Plaintiff*

Robert G. Jones
Ropes & Gray LLP
Boston, MA

Martin J. Crisp
Ryan M. Royce
Ropes & Gray LLP
New York, NY
*Counsel for Defendants*

<u>VERNON S. BRODERICK, United States District Judge</u>:

      Lead Plaintiff National Elevator Industry Pension Fund ("Plaintiff" or "NEIPF") brings

this action against Defendants Canada Goose Holdings Inc. ("Canada Goose" or the

"Company"); Dani Reiss ("Reiss"), Chairman, Chief Executive Officer ("CEO"), and President

of Canada Goose; Jonathan Sinclair ("Sinclair," and together with Reiss, the "Individual

Defendants"), Chief Financial Officer ("CFO") and Executive Vice President of Canada Goose;

and Bain Capital, LP ("Bain Capital") and its affiliates (collectively, the "Bain Defendants," and

together with Canada Goose and the Individual Defendants, the "Defendants"), asserting

violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15

U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

Before me is Defendants' motion to dismiss Plaintiff's Consolidated First Amended Complaint.[1]

(Doc. 60.)  Because Plaintiff fails to plausibly allege false statements or omissions, a strong

inference of scienter, and control person liability, Defendants' motion to dismiss Plaintiff's

Amended Complaint is GRANTED.

## I.    **Factual Background**[2]

Canada Goose is a clothing company known for its cold-weather gear that is listed and

traded on the New York Stock Exchange.  (Am. Compl. ¶¶ 22, 35.)  During the entire class

period, the Bain Defendants owned a majority of Canada Goose's voting shares.  (*Id.* ¶ 30.)

Canada Goose completed its initial public offering ("IPO") on March 21, 2017.  (*Id.* ¶ 41.)  The

company reported annual growth of 39% for fiscal year 2017 and 46% for fiscal year 2018.  (*Id.*)

In June 2018, a couple months before the class period began, Evercore wrote an analyst report

calling Canada Goose "one of [the] top global growth brand stocks" and CIBC reported that

Canada Goose had "vastly exceeded expectations" since the IPO.  (*Id.* ¶ 42.)

Before the class period began, the company's revenue growth exceeded its inventory

growth.  (*Id.* ¶ 44.)   In the fourth quarter of fiscal year 2018, Canada Goose sped up its inventory

---

[1] "Amended Complaint" or "Am. Compl." refers to Plaintiff's Consolidated First Amended Complaint.  (Doc. 43.)

[2] The facts set forth herein are taken from allegations in the Amended Complaint.  (Doc. 43.)  I assume Plaintiff's allegations in the Amended Complaint to be true for purposes of the motion.  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  However, my reference to these allegations should be not construed as a finding as to their veracity, and I make no such findings.

growth; on August 9, 2018, the beginning of the class period, the company's inventory growth was at 35.3% and rapidly increasing.  (*Id.* ¶¶ 44–45.)

Canada Goose reports its results in two segments that are aligned with its sales channels: (1) wholesale, in which Canada Goose sells to retail partners and distributors at thousands of points of distribution; and (2) direct-to-consumer ("DTC"), which consists of e-commerce sites and retail stores.  (*Id.* ¶ 38.)  Canada Goose typically realizes a significant portion of its annual wholesale revenue during the second and third quarters of a fiscal year, while it typically realizes a significant portion of its annual DTC revenue in the third and fourth quarters of a fiscal year. (*Id.* ¶ 39.)  Canada Goose's DTC channel is particularly important to its growth strategy, in large part because Canada Goose has higher margins on the products it sells through the DTC channel than products it sells in the wholesale channel.  (*Id.* ¶ 11.)  In fiscal year 2019, more consumers than usual in the DTC channel began to purchase heavyweight parkas earlier than usual, suggesting that the DTC channel would generate relatively less revenue than usual in its third and fourth quarters in fiscal year 2019.  (*Id.*)

### A.  *August 9, 2018:  The Class Period Begins*

On August 9, 2018, Canada Goose filed its Form 6-K with the SEC for the first fiscal quarter for 2019.  (*Id.* ¶ 55.)  The company reported $44.7 million in total revenue, an increase in 58.5% from the previous year.  (*Id.* ¶ 56.)  In a press release, Canada Goose stated that it expected an annual revenue growth of at least 20% in fiscal year 2019.  (*Id.* ¶ 58.)  Canada Goose also experienced 35.3% in inventory growth, lower than its revenue growth.  (*Id.* ¶ 45.) The company further stated that "[t]he overall shift of sales from the wholesale segment to the DTC segment continued in the first quarter of fiscal 2019, and is expected to continue."  (*Id.* ¶ 59.)

During a conference call with analysts and investors, Reiss called the DTC channel "a standout performer" and highlighted the fact that it increased to 51.9% of total revenue in the first quarter, compared to 28.5% the previous year.  (*Id.* ¶ 62.)  Reiss also said on the call that Canada Goose would continue to "build demand ahead of supply."  (*Id.*)  Similarly, Sinclair stated that "what we're also doing is making sure that inventory is there to meet demand."  (*Id.* ¶ 66.)  Asked about timing shifts in the DTC channel given the company's statements that consumers were "buying parkas early," Reiss said only that he would not "speculate on what is going to happen in the future quarters."  (*Id.* ¶ 63.)  Sinclair also denied that there was any "underlying shift in demand."  (*Id.*)

### B. *November 14, 2018:  Second Quarter 2019 Financial Results*

On November 14, 2018, Canada Goose filed its Form 6-K with the SEC for the second fiscal quarter for 2019.  (*Id.* ¶ 71.)  The company experienced 33.7% revenue growth and 46.4% inventory growth, the first time in four quarters that inventory growth exceeded revenue growth.  (*Id.* ¶¶ 10, 72, 74.)  In its accompanying press release, the company stated that—based on the company's strength, with a "particularly significant contribution from the DTC channel"—it had revised its fiscal year 2019 projections to estimate annual revenue growth of at least 30%, up from its initial estimate of at least 20%.  (*Id.* ¶ 75.)

On a conference call with analysts and investors, Reiss stated that the company was "continu[ing] to significantly grow our wholesale business alongside the great success of our direct-to-consumer channel" and that the company was in "an amazing position going into our peak selling season."  (*Id.* ¶ 79); (*see also id.* ¶ 81) (Sinclair expressing similar sentiments).  Asked about the company's increase in inventory, Sinclair and Reiss acknowledged that inventories had grown significantly, but both attributed it to the company adding six new stores

and an additional website, which required more inventory.  (*Id.* ¶ 83–84.)  Sinclair stated that

Canada Goose's inventory was "consistent with the sorts of levels of revenue growth and

network growth that we're talking about," while Reiss stated that the company was "very happy

with the growth rates."  (*Id.*)

### C.  *November 2018:  Reiss and the Bain Defendants Sell Shares*

Sometime in November 2018, the Bain Defendants sold more than 7.4 million

subordinate voting shares on the open market, earning gross proceeds upwards of $477 million.

(*Id.* ¶ 32.)  The Bain Defendants retained a majority of voting shares after the sale.  (*Id.* ¶¶ 31–

32.)  On or around November 29, 2018, Reiss sold 1.5 million shares of his subordinate voting

stock, "[Canada Goose's] Subordinate Voting Shares Offering for proceeds of nearly $97 million

USD."  (*Id.* ¶ 12.)  Both transactions occurred when the company's stock was priced near its all-

time high.  (*Id.* ¶¶ 12, 32.)

### D.  *February 14, 2019:  Third Quarter 2019 Financial Results*

On February 14, 2019, Canada Goose filed its Form 6-K with the SEC for the third fiscal

quarter for 2019.  (*Id.* ¶ 88.)  The company reported 50.2% in revenue growth and 74.5% in

inventory growth, meaning inventory growth outpaced revenue growth for the second straight

quarter.  (*Id.* ¶¶ 89–90.)  Canada Goose reported gross margin declines in both the wholesale and

DTC inventory channels, which it blamed on "higher labour costs due to the onset of Ontario's

minimum wage increase."  (*Id.* ¶ 89.)  Canada Goose again revised its projections for annual

revenue growth in fiscal year 2019, projecting somewhere "in the mid-to-high thirties."  (*Id.* ¶

91.)  The company's third quarter management discussion and analysis ("MD&A")[3] stated that

---

[3] An MD&A is a section of a public company's financial reports, such as an annual 10-K report or a quarter 10-Q report, that "provides a window into management's thinking on the firm's financial prospects" and health.  Kevin S. Haeberle & M. Todd Henderson, *Making a Market for Corporate Disclosure*, 35 Yale J. Reg. 383, 426 (2018).  "[I]nformation traders commonly use the information in the MD&A section of 10-Ks, 10-Qs, and registration

the decrease in DTC gross margins was due to "a shift in product mix, with a higher proportion of lightweight down jacket sales."  (*Id.* ¶ 94.)  The company also stated that it had increased its funds "to acquire inventory . . . in anticipation of growing customer demand in the fourth quarter of fiscal 2019."  (*Id.* ¶ 93.)  Sinclair, responding to a question about Canada Goose's rise in inventory, said that "what you see now is an inventory being built in advance of our fiscal year 2020."  (*Id.* ¶ 98.)

On a conference call with analysts and investors, Reiss again said that the company was continuing to "create demand ahead of supply."  (*Id.* ¶ 95.)  Sinclair stated that Canada Goose was experiencing "significantly more purchasing occurring earlier" in both the DTC and wholesale channels, meaning that investors could expect "naturally lower rate of speed in both channels through the remainder of the fiscal year."  (*Id.* ¶ 96.)  Sinclair and Reiss said they were pleased with the high level of inventory growth, stating that a lot of that growth was preparing for fiscal year 2020.  (*Id.* ¶¶ 98–101.)  Reiss stated that the company was "really happy" with "our early indications for our wholesale order book next year."  (*Id.* ¶ 102.)  Canada Goose's stock fell nearly 13% after the company's third quarter disclosures.  (*Id.* ¶ 103.)

### E.  *May 29, 2019:  End of Class Period*

On May 29, 2019, Canada Goose disclosed that, for the fourth fiscal quarter of 2019, revenue grew by 25% and DTC revenue increased by 29.1%, below the analysts' estimates of 40% DTC revenue growth.  (*Id.* ¶ 109.)   In a press release, the company disclosed that it now expected annual revenue growth of at least 20% for fiscal year 2020, about half of what the company had reported in the previous three years.  (*Id.* ¶ 110.)  On a conference call with analysts and investors, Reiss stated that the company had shifted its approach from "building

---

statements to make informed buy and sell decisions."  *Id.*

demand ahead of supply" to "building inventory ahead of demand," and that "this reflects the change in our model of building demand ahead of supply." (*Id.* ¶ 111.) Sinclair acknowledged that DTC's lower-than-expected revenue growth was due to "earlier consumer purchasing of full winter product versus the previous year." (*Id.* ¶ 113.) Canada Goose's stock fell 31% by the end of the day. (*Id.* ¶ 114.)

## II.    Procedural History

On September 3, 2019, Plaintiff Li Hong Cheng brought this securities fraud class action lawsuit. (Doc. 1.) On that same day, Pomerantz LLP published a notice of the complaint on Globe Newswire in accordance with the Private Securities Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-1(a)(3)(A)(i). (Doc. 11-3.) The notice detailed the claims in the complaint and informed class members that they had until November 4, 2019 to file to seek appointment as lead plaintiff. (*Id.*) On November 4, 2019, three class members filed motions seeking to be appointed lead plaintiff and for approval of lead counsel. (Docs. 8, 12, 14.) On December 5, 2019, I appointed NEIPF as the lead plaintiff in the case and its selection of Robbins Geller Rudman & Dowd LLP as class counsel. (Doc. 27.) On February 18, 2020, NEIPF filed an amended class action complaint. (Doc. 43.) On May 12, 2020, Defendants filed a motion to dismiss the Amended Complaint, accompanied by a memorandum of law, a declaration, and several exhibits. (Docs. 60–62.) Plaintiff filed its memorandum of law in opposition on July 10, 2020. (Doc. 63.) The motion became fully briefed when Defendants filed their reply memorandum of law on August 14, 2020. (Doc. 64.)

## III.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id*.  "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor.  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id*.  A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  "[A] complaint alleging securities fraud must satisfy Rule 9(b), which requires that 'the circumstances constituting fraud . . . shall be stated with particularity.'" *Id*. (quoting Fed. R. Civ. P. 9(b)).  This standard requires that the complaint "(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent." *Id.*

## IV.  **Discussion**

### A.  *Section 10(b) and Rule 10-b5*

#### 1.  **Applicable Law**

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit fraud

in connection with the purchase or sale of securities.  *See* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-

5.  Rule 10b-5(b) targets misleading disclosures, and Rules 10b-5(a) and (c) target deceptive

conduct.  *See SEC v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010); *see also Wilson v. Merrill*

*Lynch & Co.*, 671 F.3d 120, 129 (2d Cir. 2011) ("Section 10(b), in proscribing the use of a

manipulative or deceptive device or contrivance, prohibits not only material misstatements but

also manipulative acts.") (internal quotation marks omitted); *United States v. Finnerty*, 533 F.3d

143, 148 (2d Cir. 2008) ("'Conduct itself can be deceptive,' and so liability under § 10(b) or

Rule 10b-5 does not require 'a specific oral or written statement.'") (quoting *Stoneridge Inv.*

*Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008)).

To plead a Rule 10b-5(b) disclosure violation, the SEC must allege that the defendant

"(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with

the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance

was the proximate cause of their injury."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d

Cir. 2005).  "A false statement was made with the requisite scienter if it was made with the

'intent to deceive, manipulate, or defraud.'"  *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016)

(quoting *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)).

The PSLRA, which amended the Exchange Act, provides for "a statutory safe-harbor for

forward-looking statements." *Slayton v. Am. Express Co.*, 604 F.3d 758, 765 (2d Cir. 2010).

Under the PSLRA, a forward-looking statement is "(i) identified as a forward-looking statement,

and is accompanied by meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the forward-looking statement; or (ii)

immaterial."  15 U.S.C. § 78u-5(c)(1)(A).  The safe harbor provision "requires dismissal if the

plaintiffs do not 'prove that the forward-looking statement . . . was . . . made or approved by [an

executive officer] with actual knowledge by that officer that the statement was false or

misleading.'"  *Slayton*, 604 F.3d at 773 (emphasis omitted) (quoting 15 U.S.C. § 78u-5(c)(1)(B)).

### 2.  Application

The parties agree that there are two categories of statements or omissions at issue in this

litigation:  (1) those related to the phenomenon of consumers purchasing the company's

heavyweight parkas in the DTC channel earlier than expected—Timing Shifts—and (2) those

related to the company's inventory level and its relationship to consumer demand and revenue

growth—Inventory and Future Demand.  (*See* Doc. 61, at 12; Doc. 63, at 8.)  I will discuss these

two sets of statements separately.

### a.  Timing Shifts

Plaintiff alleges that "Defendants failed to disclose that customers in [Canada Goose's]

DTC channel were purchasing higher-margin, heavy weight parkas" earlier in the year, (Am.

Compl. ¶ 70(c)), such that disproportionately fewer people would be purchasing them in the third

and fourth fiscal quarters, when Canada Goose "typically recognizes a significant portion of its

annual DTC revenue," (*id.* ¶ 11).  Defendants failed to disclose that "the Company's 3Q19 and

4Q19 financial results . . . would be negatively impacted" by an increasing number of consumers

deciding to buy their heavyweight parkas earlier in the fiscal year.  (*Id.* ¶ 70(c).)  Such a failure

to disclose was highly significant, because Canada Goose's "DTC segment was critically important to Canada Goose's stated growth strategy and its financial results," in large part "because the Company generates higher margins on the products it sells directly through its DTC channel" than it does in its wholesale channel.  (*Id.* ¶ 11.)  In this way, Plaintiff's allegations with regard to the DTC channel concern omissions or failure to disclose information, rather than misstatements.

Section 10 "do[es] not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  "A company has no duty to disclose information 'merely because a reasonable investor would very much like to know' that information."  *S.C. Ret. Sys. Grp. Trust v. Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).  However, "once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).  To establish that a statement of opinion was misleading on the basis of an omitted fact, a plaintiff must:  (1) identify the omitted fact, (2) show that "the omitted fact would have been material to a reasonable investor," (3) establish that the omitted fact rendered the opinion misleading to a reasonable investor, and (4) take into account the "statement's context," including relevant "hedges, disclaimers, or qualifications."  *Omnicarrer, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 196 (2015).

Here, Defendants on several occasions actually disclosed the information at issue, a fact Plaintiff concedes.  At the very beginning of the class period—on August 9, 2018, on the conference call with investors and analysts following the announcement of the results from the first fiscal quarter of 2019—Reiss stated that "[o]n the product side . . . people are buying their

parkas early." (Doc. 62-7, at 5.)[4]  Plaintiff acknowledges this in passing in its Amended

Complaint, but alleges that Reiss "avoided answering" a subsequent question about "whether

investors should expect any impact to the back half of the year in the Company's DTC channel."

(Am. Compl. ¶ 63.)  Plaintiff misstates what Reiss was asked.  Reiss was not asked whether

Canada Goose anticipated lower DTC revenue levels in the third and fourth fiscal quarters of

2019, but rather whether Canada Goose felt that consumers buying heavyweight parkas earlier in

the year meant that there might be changes in "the seasonality of the business over time."  (Doc.

62-7, at 14.)  The questioner, in other words, asked Reiss about whether in the future—meaning

potentially "several more years" down the line, (*id.*)—he expected that the DTC channel would

experience comparable levels of growth in the first half of the year as compared to the second

half.  Considering the specific question that was asked, Reiss' response—that he would "not

speculate on what is going to happen in the future quarters"—is a reasonable one.  *See, e.g.*,

*Lipow v. Net 1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015) ("[W]here an

outcome is merely speculative, the duty to disclose does not attach.").

Plaintiff also acknowledges that, after the announcement of Canada Goose's results for

the third fiscal quarter, Defendants disclosed that "the Company was experiencing 'significantly

more purchasing occurring earlier' in both the wholesale and DTC channels," and that investors

should "expect 'a naturally lower rate of speed in both channels through the remainder of the

---

[4] I note that, in evaluating Defendants' motion to dismiss, I am relying in part on the transcripts of the four conference calls with analysts and investors that Defendants held during the class period.  A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).  Plaintiff did not append as an exhibit the transcripts at issue when it filed its complaint or Amended Complaint in this case.  However, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."  *Id.* at 153 (internal quotation marks omitted).  These conference call transcripts are clearly integral to Plaintiff's Amended Complaint here, given that Plaintiff heavily relies on and quotes many statements made by Reiss and Sinclair in the Amended Complaint for both of their claims.  Plaintiff also did not object to Defendants citing these transcripts in their memorandum of law supporting their motion to dismiss.  (*See* Doc. 63.)

fiscal year.'"  (Am. Compl. ¶ 96); (*see also* Doc. 62-12, at 8).  In an attempt to address

Defendants' disclosure, Plaintiff suggests that Defendants only "partially disclosed" information

about how timing shifts could hurt the company's revenue in the fourth quarter, and that

Defendants "failed to disclose the full, negative impact" of those shifts.  (Am. Compl. ¶ 108(b));

(Doc. 63, at 10–11).

     As an initial matter, the legal standard does not necessarily require Defendants to disclose

the "full, negative impact"; indeed, it is Plaintiff's burden to establish that any omitted fact was

both "material" and that its omission would be "misleading to a reasonable investor.

*Omnicarrer, Inc.*, 575 U.S. at 196.  More fundamentally, it is hard to understand what more

Plaintiff believes Defendants were required to disclose with regard to the timing shifts.

Defendants not only acknowledged the precise phenomenon at issue—that "significantly more

purchasing" had occurred earlier in the year in the DTC channel—but went further, warning

investors that DTC growth would be slowed for the rest of the fiscal year.  (Am. Compl. ¶ 96);

(*see also* Doc. 62-12, at 8).  This is in keeping with the "philosophy of full disclosure" that

animates Section 10(b).  *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 328

(S.D.N.Y. 2004) (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151

(1972)).  Contrary to what Plaintiff alleges, Defendants plainly disclosed that "the timing shift

would negatively impact the Company's last two fiscal quarters."  (Doc. 63, at 11.)

     To the extent that Plaintiff is arguing that Defendants should have disclosed more

granular, empirical, or dire information about the precise impact the timing shifts would have on

the third and fourth quarters—an argument Plaintiff does not explicitly make—this argument

must fail because Plaintiff's Amended Complaint does not even allege that Defendants possessed

or had access to any such information.  *See Constr. Laborers Pension Tr. v. CBS Corp.*, 433 F.

Supp. 3d 515, 536 (S.D.N.Y. 2020) (finding that plaintiff's claim for failure to disclose under Section 10(b) was not actionable because "[t]he Amended Complaint does not allege that Defendants knew" the piece of information they failed to disclose).  Moreover, even if such information existed, Plaintiff would need to demonstrate that the information was material and that Defendants were obligated to disclose such information.  Absent allegations that Defendants possessed but withheld more detailed or more alarming information related to these timing shifts sufficient to make their prior disclosures legally deficient, Plaintiff cannot plausibly allege that Defendants withheld material information about these timing shifts.  As such, I find that Defendants properly disclosed the information at issue here.

### b.  Inventory and Future Demand

Plaintiff further argues that a second category of statements are actionable:  that "Defendants repeatedly, yet misleadingly, conveyed to investors that the Company was building customer demand ahead of supply," which "created the misleading impression that Canada Goose's massive spikes in inventory were justified by increasing demand and accelerated growth consistent with historical trends."  (Doc. 63, at 8–9); (*see also id.* at 10) (Defendants "perpetuated the misperception that the Company's rapidly rising inventory levels meant Canada Goose would achieve continued, impressive revenue growth").

As a preliminary matter, Defendants argue that the statements regarding inventory levels and future demand are non-actionable for three reasons.  All of these arguments fail.  First, Defendants argue that these are "statements of corporate optimism or puffery."  (Doc. 61, at 17–18.)  "[E]xpressions of puffery and corporate optimism do not give rise to securities violations," *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004), in large part because "[p]eople in charge of an enterprise are not required to take a gloomy, fearful, or defeatist view of the future,"

*Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (internal quotation marks omitted).  That said, "[s]tatements of corporate optimism may be actionable securities violations if they are worded as guarantees or are supported by specific statements of fact."  *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp.*, 783 F.3d 383, 392 (2d Cir. 2015) (internal quotation marks omitted).  Indeed, "more definite statements about a company's business practices may invoke reasonable reliance by investors."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 611 (S.D.N.Y. 2017).  Such is the case here.  The challenged statements at issue are not merely generic corporate expressions of optimism; they conveyed material information about Defendants' then-current inventory levels and demand and Defendants' reasons, at that time, for building inventory.  Plaintiff has plausibly pled that this connection between Canada Goose's inventory growth and demand—namely, whether or not the growth in Canada Goose's inventory was driven by then-existing demand—was highly relevant to investors as an indication of the company's financial health and potential for growth.  (*See, e.g.*, Am. Compl. ¶ 9) (noting Reiss "told investors that Canada Goose was building inventory in preparation for the heavy selling season in the second half of the fiscal year.").

Second, Defendants argue that these statements are "[n]on-actionable forward-looking statements" protected under the PLSRA's safe harbor.  (Doc. 61, at 18–20.)  The PLSRA's safe-harbor provision "includes several definitions of a forward-looking statement, including a statement containing a projection of . . . income (including income loss), earnings (including earnings loss) per share, . . . or other financial items and a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (internal quotation marks omitted).  The challenged statements at issue here are not forward-

looking because, as mentioned *supra*, they are not "projections" or "statement[s] of future economic performance"—rather, they concern Defendants' then-current inventory and demand levels and their then-existing business model.  Even if a certain portion of the statements could be viewed as forward-looking, the critical portions of the statements at issue, phrased in the present tense, are not projections.  (*See, e.g.*, Doc. 62-7, at 5 ("We have meaningful international tourist traffic this time of year . . . To me, this is a direct result of how we build demand ahead of supply")).

Third, Defendants argue that the "bespeaks caution" doctrine applies because at issue are "forward-looking statements [that] were accompanied by meaningful cautionary language." (Doc. 61, at 20.)  Because "the bespeaks-caution doctrine applies only to statements that are forward-looking," *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010), this argument similarly fails.

Nevertheless, Plaintiff's allegations regarding Defendants' inventory levels and future demand fail for other reasons.  Crucially, Plaintiff "has failed to identify any misstatements or omissions of material fact which would support" its claim.  *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998).  "An allegedly material misstatement must have been false at the time that it was made." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 290 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 392 (S.D.N.Y. 2006) ("a complaint must explain, with adequate specificity, why the alleged false or misleading statements were actually false or misleading when made").  "[W]ithout contemporaneous falsity, there can be no fraud." *In re Magnum Hunter*, 26 F. Supp. 3d at 290; *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014).  "The literal truth of an isolated statement is insufficient; the proper inquiry requires an

examination of defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (internal quotation marks omitted).

Therefore, analyzing the precise pronouncements Plaintiff alleges to be misstatements is required. Plaintiff does not challenge any of the financial information that Canada Goose disclosed throughout the class period—it does not specifically suggest that the company's reported inventory growth, demand growth, projected revenue growth, or any other figures are inaccurate. Rather, Plaintiff alleges that "Defendants repeatedly, yet misleadingly, conveyed to investors that the Company was building customer demand ahead of supply," giving investors a misleading impression of the company's existing demand and thus its financial health. (Doc. 63, at 8.) This allegation is materially flawed, because there are no pleaded facts that plausibly allege that the statements at issue—that Defendants were trying to build demand ahead of supply—were misleading or false when made. It is true that, as recently as February 14, 2019, Reiss reiterated that Canada Goose was "creat[ing] demand ahead of supply." (Doc. 62-12, at 5.) It is also true that, a little more than three months later on May 29, 2019, Reiss stated that there was a "change in our model of building demand ahead of supply." (Doc. 62-14, at 11.) However, these statements on their face are not necessarily false and they could easily both have been true when made—*i.e.* Defendants could have decided to change their model somewhere after February 14, 2019 and before May 29, 2019. There are few, if any, factual allegations in the Amended Complaint—and none identified in Plaintiff's briefing in opposition to the instant motion, (Doc. 63, at 7–12)—that support Plaintiff's theory that Defendants were misrepresenting the company's model up until February 2019, rather than the more realistic explanation that Defendants earnestly were building demand ahead of supply until they changed course

17

somewhere in the intervening three months between February 14, 2019 and May 29, 2019. Indeed, there is nothing unusual about a company changing course in light of changing market conditions.

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies* is instructive here. 75 F.3d 801 (2d Cir. 1996). In *San Leandro*, on March 11, 1993, Philip Morris released an annual report stating that the company had "excellent volume growth and income potential for the future" and that sales were strong. *Id.* at 807, 811. Three weeks later, on April 2, 1993, the company disclosed that retail sales dropped by 8.3% and that the company would cut prices, "a move estimated to reduce [the company's] earnings by \$2 billion in 1993" and which caused the stock to drop by 25 percent. *Id.* at 812, 805. As here, plaintiffs in *San Leandro* argued that defendants misstated and "failed to disclose that they were planning a radical change in pricing strategy for Marlboro that would reduce Philip Morris' 1993 profits." *Id.* at 808. The Second Circuit determined that the fact that there were only three weeks between the March 11 press release and the April 2 disclosure was itself insufficient to determine that the March 11 statement was false when made. *Id.* at 812 ("[P]laintiffs [do not] offer anything but conclusory allegations to support their contention that defendants knew long before the April 2 announcement that Marlboro was in trouble and that a change in strategy would be necessary."). As the Second Circuit noted in *San Leandro*, statements about the company's goal or plan "simply reflected company policy at the time; they were not promises to maintain that policy in the future, and thus were not rendered misleading by the company's subsequent consideration of an alternative plan." *Id.* at 811. The same is true here, where Plaintiff's Amended Complaint provides only conclusory and speculative assertions that "Defendants were not 'building demand ahead of supply,' but were building supply, *i.e.* inventories, ahead of demand" from the

18

beginning of the class period.  (Am. Compl. ¶ 70(a).)

Plaintiff relatedly argues that "Defendants' shifting explanations for the Company's elevated inventory" helped create "the misleading impression" that Canada Goose was building inventory to meet demand.  (*Id.* ¶ 15; Doc. 63, at 9.)  Plaintiff here references the fact that on November 14, 2018, Sinclair stated that the company's elevated inventory was due to the company increasing its number of store openings that year, (Am. Compl. ¶ 83; Doc. 62-9, at 10), while Sinclair one quarter later stated that inventory growth was "being built in advance of our fiscal year 2020," (Am. Compl. ¶ 98; Doc. 62-12, at 9).  As an initial matter, the statements on their face are not mutually exclusive; there is no reason why both statements could not have been accurate when made.  In any event, Plaintiff ignores the fact that, immediately after Sinclair made the latter comment, Reiss added that "a lot of" the reason Defendants had increased inventory levels was for fiscal year 2020, and stated further "that we do have more stores . . . and having more stores, by definition, we need more inventory to fill those stores and that also adds to the increased inventory level."  (Doc. 62-12, at 9.)  Reiss' statement, in other words, was consistent with Sinclair's comments in the previous quarter and made clear that Defendants had increased their inventory levels both because they had added stores and in advance of fiscal year 2020.  *See In re Sanofi Secs. Litig.*, 87 F. Supp. 3d 510, 532 (S.D.N.Y. 2015) (declining to find misstatements where two statements are "not inconsistent" with one another), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *see also In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 532 (S.D.N.Y. 2020) (similar).  Further, even if the statements were in tension with one another, Plaintiff again fails to plausibly allege facts indicating that either or both of the particular statements were false when made.

Finally, Plaintiff argues that Defendants' statements created "the misleading impression

that the Company would continue to experience . . . accelerated growth commensurate with historical trends," but by the end of the class period, "Canada Goose's FY20 revenue was expected to grow at only half the rate that the Company's revenue had grown in prior years." (Am. Compl. ¶¶ 70(b), 87(b), 108(c).)  There are several problems with this argument.  First, as Defendants rightly note, (Doc. 61, at 13), the Amended Complaint never alleges that Defendants themselves ever claimed that they expected to "accelerate growth commensurate with historical trends."  Second, Defendants' final projection for fiscal year 2020—that "the Company expected annual growth of at least 20%," (Am. Compl. ¶ 110)—is exactly what the company had initially projected for fiscal year 2019, (*id.* ¶ 75).  In this way, Defendants' fiscal year 2020 revenue projection was generally in line with their previous estimates and does not constitute an anomaly. Third, and most fundamentally, Plaintiff again provides no factual allegations that Defendants knew about these more meager revenue projections for fiscal year 2020 earlier in the class period and chose to sit on them until May 29, 2019.  Absent specific, non-conclusory allegations that Defendants "knew long before" but declined to disclose these revenue projections, *San Leandro*, 75 F.3d at 812, Plaintiff falls short of a plausible claim, particularly given that these allegations are forward-looking and thus would have to satisfy the high bar mandated under the PSLRA safe harbor.

Therefore, I conclude that Plaintiff has not adequately pleaded a material misstatement or omission, which alone warrants dismissal of the claim for securities fraud under § 10(b) and Rule 10b-5.  I nevertheless turn to scienter, which provides an alternate basis for dismissal.

### B.  *Scienter*

#### 1.  **Applicable Law**

Pursuant to the PSLRA, a well-pleaded securities fraud claim must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'"  *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).  In the Second Circuit, a strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.*

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud," a plaintiff must allege that the defendant or its officers "benefitted in some concrete and personal way from the purported fraud."  *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)).  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *Id.*

As an alternative to the motive and opportunity to defraud, a plaintiff can raise a strong inference of scienter under the "strong circumstantial evidence" prong, requiring a plaintiff to show conscious misbehavior or recklessness.  *Id.* at 199.  Conscious misbehavior "encompasses deliberate illegal behavior," *Novak*, 216 F.3d at 308, whereas recklessness includes "conscious recklessness" or "a state of mind approximating actual intent, and not merely a heightened form of negligence," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)

(emphasis omitted) (quoting *Novak*, 216 F.3d at 312).  If motive to commit fraud has not been

shown, "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v.*

*Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Beck v. Mfrs. Hanover Tr. Co.*, 820 F.2d 46,

50 (2d Cir. 1987)).

      Additionally, a strong inference of scienter "must be more than merely plausible or

reasonable—it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  There are at least four circumstances that "may

give rise to a strong inference of the requisite scienter:  where the complaint sufficiently alleges

that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2)

'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information

suggesting that their public statements were not accurate'; or (4) 'failed to check information

they had a duty to monitor.'"  *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311).

      Prior to the passage of the PLSRA, a plaintiff could allege scienter as to individual

defendants and a company if the misleading statements and/or omissions related to a core

operation of the company.  *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989).  The Second

Circuit has not definitively addressed the continued independent viability of the core operations

doctrine after the passage of PLSRA.  *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d

Cir. 2012) ("[W]e have not yet expressly addressed whether, and in what form, the 'core

operations' doctrine survives as a viable theory of scienter.").  That said, "[m]any courts in this

District have questioned the continued viability of the core operations doctrine following the

PSLRA." *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 474 (S.D.N.Y. 2017); *see also*

*Sachsenberg v. IRSA Inversiones Y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169,

183 (S.D.N.Y. 2018) ("District courts in this Circuit have questioned the continued viability of

the core operations doctrine following the PSLRA."); *Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016) ("[T]here is considerable doubt whether the core operations doctrine survived enactment of the PSLRA, and many courts have held that it is no longer valid.") (internal quotation marks omitted)); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (collecting cases).

## 2. Application

As an initial matter, with regard to the core operations doctrine, without more definitive guidance from the Second Circuit, I will apply the modified approach followed by district courts in this Circuit, and consider the "core operations" allegations to constitute a supplementary, but not an independent, means to plead scienter.  *See Fialkov v. Alcobra Ltd.*, No. 14 Civ. 09906 (GBD), 2016 WL 1276455, at *7 (S.D.N.Y. Mar. 30, 2016) ("The majority of courts in the Second Circuit have found that the core operations doctrine may provide support for but not an independent basis of scienter.") (internal quotation marks omitted).  As a result, I will consider the core operations allegations as part of a "holistic assessment of the scienter allegations." *Shemian v. Research In Motion Ltd.*, No. 11 Civ. 4068(RJS), 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013) (quoting *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 872 (S.D.N.Y. 2011)), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

Plaintiff makes four main arguments in an attempt to satisfy its burden to establish scienter.  (*See* Am. Compl. ¶¶ 121–30; Doc. 63, at 19–28).  First, Plaintiff notes the "[t]he Individual Defendants' high-ranking positions" are probative in large part because Reiss and Sinclair had responsibility and oversight over "the very topics about which the [Amended Complaint] alleges Defendants misled investors."  (Doc. 63, at 20–21.)  It is true that this is a relevant factor, *see In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017), but

Plaintiff cannot satisfy its burden "by virtue of [Individual Defendants'] high-level positions" alone, *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 387 (E.D.N.Y. 2003); *see also In re Sec. Capital Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 595 (S.D.N.Y. 2010) ("Plaintiffs' broad allegations that Defendants received and were aware of information contradicting their public statements because they held management roles is not enough to allege scienter.").  Reiss' and Sinclair's high-level positions are thus helpful to, but not decisive for, Plaintiff's scienter argument.

Second, Plaintiff argues that Defendants were particularly motivated because of how important it was to Canada Goose to have a strong DTC channel and be perceived as a hyper-growth company.  (Doc. 63, at 21–22; Am. Compl. ¶ 122, 126–27.)  This argument is unpersuasive, and expressly prohibited under the case law.  As noted *supra*, Plaintiff cannot "proceed based on motives possessed by virtually all corporate insiders," such as the desire to "sustain the appearance of corporate profitability" or "to maintain a high corporate credit rating." *Novak*, 216 F.3d at 307 (internal quotation marks omitted).

Third, Plaintiff points to the more-than 9 million shares that Reiss and the Bain Capital Defendants sold for more than $570 million in November 2018.  (Doc. 63, at 22–27; Am. Compl. ¶¶ 124–25).  I find that these stock sales are marginally helpful to Plaintiff's scienter argument.  Broadly speaking, a plaintiff's burden to establish motive and opportunity "is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA*, 553 F.3d at 198.  For this reason, Plaintiff argues that these stock sales, which occurred shortly after Defendants announced their second quarter results, constitute a strong inference of scienter.  However, certain facts cut against Plaintiff's argument with regard to these stock sales.  Defendants' sales were made roughly six months before "the revelation of

the alleged falsity," which "attenuates any inference of scienter" in Plaintiff's favor.  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008).  Reiss, who played a far more central role in managing and operating Canada Goose than the Bain Defendants, sold only about 7% of his holdings, (Doc. 61, at 26; Doc. 63, at 26); "courts of this district have held that insider sales that represent less than ten percent of that insider's total holdings are insufficiently unusual to permit an inference of scienter," *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595 (S.D.N.Y. 2006) (internal quotation marks omitted).[5]  Further, as even Plaintiff appears to concede, (Doc. 63, at 24), while not dispositive, "the fact that the Individual Defendants sold only in public offerings cuts against an inference of scienter, because it suggests a motive that is 'generally possessed by most corporate directors and officers.'"  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 420 (S.D.N.Y. 2020) (quoting *Kalnit*, 264 F.3d at 139).  Finally, Defendants argue, (*see* Doc. 61, at 25) (citing Doc. 62-10), and Plaintiff does not contest, (Doc. 63, at 24), that these sales were a pre-planned secondary equity offering, which also cuts against the idea that these stock sales were unusual or suspicious.  Thus, I find that these stock sales are not entitled significant weight in assessing scienter.

Fourth, Plaintiff argues that the fact that there was merely a three-month gap between the time when Defendants stated they were building demand ahead of supply and when Defendants stated they were building inventory ahead of demand is probative of scienter.  (Doc. 63, at 27–

---

[5] The Bain Defendants sold about 19.5% of their shares in November 2018.  (Doc. 61, at 26–27; Doc. 63, at 26).  Even though this comprises a larger percentage than the shares Reiss sold, at least some courts in this District have found that similar percentages were not unusual or suspicious.  *See, e.g.*, *In re Gildan Activewear*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (finding stock sales of 22.5% of holdings did not constitute strong inference of scienter); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) (finding that stock sales of 17.4% of an individual's holdings were "insufficient to establish motive").  The allegations against the Bain Defendants are weakened further when considering that they still maintained a majority stake in the company even after making the stock sales at issue.  (*See* Doc. 63, at 24.)

28; Am. Compl. ¶ 129.)  This argument merits little weight, because Plaintiff fails to provide any factual allegations that Defendants did not adjust their model in the intervening three months. Changing one's mind or methodology without more cannot be the basis for finding scienter. Indeed, as noted above, businesses should be encouraged to innovate and change course when necessary in the face of shifting market conditions.

Taken together, I find that the factual allegations here do not give rise to a strong inference of scienter.  With regard to establishing scienter, "Second Circuit cases uniformly rely on allegations that [1] specific contradictory information was available to the defendants [2] at the same time they made their misleading statements." *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2007) (internal quotation marks and emphasis omitted).  Although Plaintiff "do[es] not have to fix the exact date and time" that Defendants were aware that their statements were false, "they must supply some factual basis for the allegation that the defendants had reached this conclusion at some point during the time period alleged." *Rothman*, 220 F.3d at 91 (internal quotation marks omitted).  The Amended Complaint does not include anything beyond conclusory allegations indicating that Defendants were "aware of adverse information at the time" they spoke.  *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 378 (S.D.N.Y. 2007).  Instead, Plaintiff is left with a hodgepodge of circumstantial evidence—some of which is at best marginally probative, some of which is not—that fails to indicate that Defendants had any specific contradictory information in their possession when they made their statements during the class period.  Plaintiff's allegations amount to little more than a suggestion that "Defendants must have known" their statements were false when they made them, which is clearly insufficient to satisfy Plaintiff's burden at the pleading stage.  *In re Nokia Oyj*, 423 F. Supp. 2d at 410.

### C.  *Section 20(a)*

Section 20(a) of the Exchange Act provides a cause of action against anyone who exercises control over individuals who violate the securities laws.  *See Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting 15 U.S.C. § 78t(a)) ("Section 20(a) of the Exchange Act provides that individual executives, as 'controlling persons' of a company, are secondarily liable for their company's violations of the Exchange Act."). Pursuant to §20(a):

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To establish a prima facie claim under §20(a), the elements are "a primary violation of the securities laws by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *In re Bernard L. Madoff Inv. Secs. LLC*, 739 F. App'x. 679, 685 (2d Cir. 2018) (internal quotation marks omitted).  Because the Amended Complaint fails to adequately plead a primary violation under Section 10(b), there is no basis for a primary violation upon which any Section 20(a) claim might be predicated.  Consequently, Defendants' motion to dismiss Plaintiff's claim brought pursuant to Section 20(a) against the individual and Bain Defendants is GRANTED.

## V.    <u>**Conclusion**</u>

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  The Clerk's office is directed to terminate the open motion at Document 60 and close this case.

SO ORDERED.

Dated: July 19, 2021
        New York, New York

                                            Vernon S. Broderick
                                            United States District Judge